**HAMILTON WATCH CO. v. BENRUS WATCH CO., Inc.**

No. 283, Docket 22736.

United States Court of Appeals Second Circuit.

Argued June 2, 1953.

Decided June 30, 1953.

---

and Eugene Eisenmann, New York City, of counsel), for defendant-appellant.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

Thomas G. Meeker, New Haven, Conn., Stephen Ailes and Richard A. Whiting, Washington, D. C. (Gumbart, Corbin, Tyler & Cooper, New Haven, Conn., Steptoe & Johnson, Washington, D. C., and Richard J. Blakinger, Lancaster, Pa., of counsel), for plaintiff-appellee.

Wiggin & Dana, New Haven, Conn., Proskauer, Rose, Goetz & Mendelsohn, New York City (Joseph M. Proskauer, Milton C. Weisman, J. Alvin Van Bergh

FRANK, Circuit Judge.

The trial judge's opinion, findings of fact and conclusions of law are reported in D.C., 114 F.Supp. 307. As the facts are

there fully set forth, we do not repeat them in detail.

■ 1. Defendant argues that it appears unmistakably that defendant did not violate Section 7 of the Clayton Act. Were that true, we would now know that plaintiff could have no final relief, and that therefore the granting of the preliminary injunction was an obvious error; indeed, we might direct dismissal of the complaint. But we think that the present record sufficiently discloses that the court, after a trial, may be required to conclude that Benrus was not innocent of a Section 7 violation. To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.[2]

As here the trial judge's findings derived from evidence presented at a preliminary hearing, they may perhaps be altered after a full-dress one. Yet, although we recognize them as necessarily tentative, they have such support in the oral testimony that we cannot possibly declare them "clearly erroneous"; we must therefore accept them on this appeal. Nor, on the basis of those findings, can we hold that the judge erred in temporarily holding, in effect, as follows: (a) The acquisition of control of Hamilton by Benrus very probably would substantially lessen competition in "a line of commerce" within the meaning of Section 7. (b) The purchases by Benrus of Hamilton shares were not made "solely for investment" but for the primary purpose of obtaining such control; had this purpose not been frustrated by action of Hamilton's management, Benrus would successfully have carried it out. (c) Those purchases therefore violated Section 7. (d) Purchases thus unlawfully made do not cease to be unlawful—so as to preclude an order of divestment—because the purpose is balked.[3]

2. See, e. g., City of Newton v. Levis, 8 Cir., 79 F. 715; Pratt v. Stout, 8 Cir., 85 F. 2d 172, 176–177 and cases there cited; Doernhoefer v. United States, 8 Cir., 190 F.2d 358, 359, 361; Wing v. Arnall, Em. App., 198 F.2d 571, 574; City of Louisville v. Louisville Home Telephone Co., 6 Cir., 279 F. 949, 956; Fordson Coal Co. v. Maggard, 6 Cir., 2 F.2d 708; Harriman v. Northern Securities Co., C.C. N.J., 132 F. 464, 475–478, and cases there cited; see also note 10 infra.

3. Cf. Lorain Journal Co. v. United States, 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162; United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978; Goshen Manufacturing Co. v. Hubert A. Myers Manufacturing Co., 242 U.S. 202, 37 S.Ct. 105, 61 L. Ed. 248; Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 448.
Section 7 refers to the acquisition of "the whole or any part of the stock".
Without resting our opinion on them, we note the following facts: There are 387,109 outstanding voting—i.e., common—shares of Hamilton. When there

were sure to be in the voting trust but 45,478, Benrus had acquired about 79,-000. When the preliminary injunction issued, Benrus had 92,000; there were 154,908 sure to be in the voting trust; and about 139,000 in other hands of which enough were friendly to the management to give it, together with the shares in the voting trust, a majority. However, it does not appear that, except for the injunction, Benrus might not have gained a majority by buying all or most of the 139,000 shares and/or all or most of the 34,900 non-voting preferred shares each of which at the holder's option is convertible into four shares of (voting) common.

In his opinion, the trial judge said: "In the situation here, I incline to the view that the acquisition if made only with intent to obtain minority representation constituted a violation of Sec. 7: having in mind the probable effect on the relevant 'line of commerce' of the competitive practices of these two competitors and the practical considerations that confront the board of directors of any corporation in a competitive enterprise, I think it fairly inferable that minority representation, because of the opportunity thereby afforded to persuade or

Although we now indulge in no ultimate conclusion, we believe the amendment of Section 7 in 1950 certainly casts doubt on decisions—including International Shoe Co. v. F. T. C., 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431, and United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533—interpreting that section as it stood previously.[4] The Senate Committee Report stated that the intent of the amendment was "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding."[5] In-

to compel a relaxation of the full vigor of Hamilton's competitive effort would come within the ban of Section 7. In Chesapeake & Ohio Railway Company Purchase, 271 I.C.C. 5, it was held that even minority representation by a petitioning railroad on the board of a competitor would probably so disturb the competitive situation that the petitioner was restricted in the exercise of the electoral right appurtenant to its stock." On this appeal, we need not and do not consider whether, in this respect, the judge was correct.

4. See 64 Harv.L.Rev. (1951) 1212, 1213; 52 Col.L.Rev. (1952) 766, 773; H.Rep. No. 1191, 81st Cong., 1st Sess., pp. 10–11.

5. Sen.Rep.No.1775, 81st Cong., 2d Sess. (1950), dealing with the amendment, reads in part (pp. 4–5) as follows:

"*General History of H.R. 2734 and Tests of the Effect on Competition.*

"The present wording of H.R. 2734 is intended to cover more than is prohibited by the Sherman Act and yet to stop short of the stated test of the present section 7 of the Clayton Act. Section 7 of the Clayton Act was originally written to reach effects beyond those prohibited by the Sherman Act, extending to the reduction of the competition which had previously existed between the acquiring and acquired companies. This latter feature, namely the effect on competition between the acquiring and acquired corporations, has been regarded as the distinctive 'Clayton Act test,' insofar as it relates to section 7 of the Act.

"The purpose of H.R. 2734 was to make this legislation extend to acquisitions which are not forbidden by the Sherman Act. But here a problem presented itself. While on the one hand it was desired that the test be more inclusive and stricter than that of the Sherman Act, on the other hand it was not desired that the bill go to the extreme of prohibiting all acquisitions between competing companies. The present wording of H.R. 2734, but beginning with H.R. 515, introduced on April 24, 1947, represents an attempt to solve this problem. Several steps have been taken in order to achieve a solution.

"Principal among them was the deletion of any reference to the effect on competition between the acquiring and acquired firms. The first versions of the bill to amend section 7 were S. 615, introduced on February 26, 1945, and its companion measure, H.R. 4519, introduced on October 29, 1945. These bills simply extended the present wording of the Clayton Act to cover acquisitions of assets. The test of competition between the acquiring and acquired firms was left in the bill and made applicable to assets, as well as to stock. However, in the course of hearings on this bill in the House Judiciary Committee, this wording was objected to on the grounds that it might be so construed as to prevent all acquisitions between competitors. Accordingly, subsequent versions of the bill, including the present H.R. 2734, deleted any reference to the effect on competition between the acquiring and acquired firms.

"Another step which had the same general effect is also to be found in the legislative history of the present bill. As the bill originally stood, it was to be violated if, among other things, competition was substantially lessened ' * * * in any community * * * ' of the country. The use of this word raised a storm of controversy, centering around the possibility that the act, so worded, might go so far as to prevent any local enterprise in a small town from buying up another local enterprise in the same town. As a consequence, the word 'community' was dropped from the subsequent versions of the bill.

"The committee believe that the excessive sweep that has been given to section 7 of the present Clayton Act by these two features of that section has been largely responsible for the tendency of the courts in cases under that section to revert to the Sherman Act test. By eliminating the provisions of the existing section that appear to reach situations of little economic significance, it is the purpose of this legislation to assure a broader construction of the more fundamental provisions that are retained than has been given in the past. The committee wish to make it clear that the bill is not intended to revert to the Sherman Act test. The intent here, as in other parts

terference at an early stage, if possible, seems the paramount aim.

■ The judge's legal conclusions, like his fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation. For a preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began.

For the foregoing reasons, we cannot hold that the judge should have dismissed the complaint on the merits.

■ 2. There remains the question whether the judge—assuming, as he did, for the time being, that the complaint was not without merit—went outside the bounds of his discretion in ordering a preliminary injunction. We read Section 16 of the Clayton Act, 15 U.S.C.A. § 26,[6] as declaratory of the usual rule relative to the

---

of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding.

"The type of problem to which this bill is addressed was described by the Federal Trade Commission in these words: 'Under the Sherman Act, an acquisition is unlawful if it creates a monopoly or constitutes an attempt to monopolize. Imminent monopoly may appear when one large concern acquires another, but it is unlikely to be perceived in a small acquisition by a large enterprise. As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act test against them * * * Where several large enterprises are extending their power by successive small acquisitions, the cumulative effect of their purchases may be to convert an industry from one of intense competition among many enterprises to one in which three or four large concerns produce the entire supply. This latter pattern (which economists call oligopoly) is likely to be characterized by avoidance of price competition and by respect on the part of each concern for the vested interest of its rival * * * (The Merger Movement, A Summary Report, pp. 6–7).'

"To make clearer the intent to give the bill broad application to acquisitions that are economically significant, its wording has been broadened in certain respects. Thus, the phrase 'in any section of the country' was made applicable to both the lessening of competition and the tendency to create a monopoly. As the bill originally stood, it applied only to the former. Hence, an acquisition is not to be interpreted merely in terms of either its effect on competition or its tendency to create a monopoly 'in the Nation as a whole.' The act is to be violated if as a result of an acquisition, there would be a substantial lessening of competition or a tendency to create a monopoly in any section of the country.

"Similarly, the phrase 'in any line of commerce,' was also made applicable to both as above. As the bill originally stood, the phrase applied only to the tendency to create a monopoly. It is intended that acquisitions which substantially lessen competition, as well as those which tend to create a monopoly, will be unlawful if they have the specified effect in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition.

"These various additions and deletions—some strengthening and others weakening the bill—are not conflicting in purpose and effect. They merely are different steps toward the same objective, namely, that of framing a bill which, though dropping portions of the so-called Clayton Act test that have no economic significance, reaches far beyond the Sherman Act."

6. So far as pertinent, 15 U.S.C.A. § 26 reads as follows:

"Injunctive relief for private parties; exception

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18 and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by

exercise of such discretion: The judge must consider whether irreparable harm is likely to result to plaintiff if *pendente lite (i. e.,* "immediately")[7] the injunction is denied, and against this harm he must balance the harm to defendant likely to result if the relief is granted. The "hardship plaintiff will suffer * * * may make interlocutory relief imperative where the same showing at a final hearing would not outweigh the hardship the defendant would suffer from a permanent injunction. Thus in view of the character and extent of the emergency presented, of the provisional and temporary character of the relief sought, of the probable period of its duration, and of the court's tentative opinion on the substantive issues involved, the factor of relative hardship is measured, on an

application for interlocutory injunction, with a different yardstick from that used at final hearing."[8] Here no substantial harm from the injunction to defendant is perceptible; but the hardship to plaintiff, were there no injunction, would be very considerable.[9] We agree with the trial judge that the private harm to plaintiff required as a condition of granting injunctive relief under Section 16 need not be at all the same as the public harm condemned by Section 7. In the light of the evidence before the judge and his findings not unreasonably derived therefrom, we hold that he surely did not "abuse" his discretion.[10]

Affirmed.

SWAN, C. J., concurs in the result.

courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: * * *."

7. See Restatement of Torts, Section 938, comment d.

8. Restatement of Torts, Section 94, comment f.

9. See especially Findings Nos. 14, 47, 51, 53, 54, 55, 56.

10. See, e.g., All American Airways v. Village of Cedarhurst, 2 Cir., 201 F.2d 273, 276; Benson Hotel Corp. v. Woods, 8 Cir., 168 F.2d 694, 696; Ohio Oil Co. v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972.

The Ohio Oil case cites with approval Love v. Atchison T. & S. F. Ry. Co., 8 Cir., 185 F. 321, 331–332, where the court said: "But the granting or withholding of an interlocutory injunction rests in the sound judicial discretion of the court of original jurisdiction, and where, as in the case in hand, that court has not departed from the equitable principles established for its guidance, its orders may not be reversed by the appellate court, without clear proof that it has abused its discre-

tion. * * * An appeal from an order granting or refusing an interlocutory injunction does not invoke the judicial discretion of the appellate court. The question is not whether or not that court in the exercise of its discretion would make or would have made the order. It was to the discretion of the trial court, not to that of the appellate court, that the law intrusted the granting or refusing of these injunctions, and the only question here is: Does the proof clearly establish an abuse of that discretion? * * * The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated. It is a familiar rule of equity jurisprudence that if the questions presented in a suit for an injunction are grave and difficult, and the injury to the moving party will be certain, great, and irreparable if the motion for the interlocutory injunction is denied and the final decision is in his favor, while if the decision is otherwise, and the injunction is granted, the inconvenience and loss to the opposing party will be inconsiderable, or probably may, be indemnified by a bond, the injunction usually should be granted."