**C & C SUPER CORPORATION,**
**Plaintiff,**

v.

**Joseph NEWMARK, Defendant.**

United States District Court
S. D. New York.

April 30, 1957.

Satterlee, Warfield & Stephens, New York City, for plaintiff.

Gabriel Galef and Victor Jacobs, New York City, for defendant.

BICKS, District Judge.

Asserting that it was induced to enter into an agreement with the defendant by fraudulent representations,[1] plaintiff brought this suit to rescind the transaction and recover back the shares of the capital stock which were issued in payment of the purchase price. The relief sought includes an injunction restraining defendant pendente lite and permanently from disposing of any of said shares of stock and the appointment of a receiver to hold the same until the final disposition of the action on the merits.[2] Simultaneously with the institution of this suit, or nearly so, plaintiff instructed its stock transfer agent to cease transferring any shares out of defendant's name and, the stock transfer agent, consistent with its responsibilities as plaintiff's agent, has heeded the mandate. Before

---

1. The alleged fraudulent representations laid to the defendant are set out in paragraph 5 of the complaint as follows:

    (a) That, while it was impossible and impracticable to ascertain with any exactitude, prior to entering into such Purchase Agreement, from the books and records of Power the ratio of bad debts to total instalment sales of Power, he knew of his own knowledge from the experience of the company that said ratio was less than 2% and that a 2% ratio of bad debts to sales truly represented the maximum of such bad debts which would have to be deducted from accounts receivable, represented by him to amount to $823,993.51, in order to arrive at the true equity of stockholders.

    (b) that there had been no returned sales applicable to the fiscal year ending June 30, 1955 which would have to be deducted from the amount of accounts receivable as represented.

2. Additional as well as alternative relief, not material to the matter *sub judice*, is also sought.

the Court presently is a motion by defendant to enjoin plaintiff from interfering with or restricting the sale or transfer of any of his stock.

A review of some of the background material which can be gathered from the pleadings and the affidavits and exhibits submitted on this motion is necessary. Plaintiff is a "venture capital corporation" formed for the purpose of acquiring enterprises which it believes with proper management and sufficient working capital have good prospects for development and profit. Officered by financial sophisticates and represented by eminent legal counsel, plaintiff, after negotiations extending over several months, entered into a letter-agreement with the defendant dated July 25, 1955 by the terms of which in consideration of "$1.00 in hand received and for other good and valuable consideration" defendant granted to plaintiff a 10 day option to purchase 100% of the stock of two corporations, Power Products, Inc. and Champion Implements Corporation [3] for $1,000,000, payable $280,000 in cash and the balance of $720,000 in equal monthly installments of $16,744.16 commencing January 15, 1956. Prior to the execution of the letter-agreement defendant delivered to plaintiff statements on the stationery of Rosenthal, Shepard & Cobern, Certified Public Accountants, entitled "Consolidated Statement of Assets and Liabilities" of the two corporations as of May 31, 1955, "Consolidated Statement of Income and Loss for the period July 1, 1954 to May 31, 1955", and "Consolidated Schedules". The latter set forth breakdowns of the items appearing on the Income Statement under the captions "Selling expenses" and "General and administrative expenses". Each of said statements [4] prominently bore the legend "Prepared from the books without verification and for use of management only; subject to notes attached".

The balance sheet showed accounts receivable as $739,500 [5] "[l]ess Reserve for sales returns and allowances and bad debts in the same amount as at June 30, 1954" $44,000. The income statement reflected gross installment sales as $1,425,000, less returns and allowances of $177,000, and net sales of $1,248,000. Opposite the legend referring to sales and returns on the balance sheet and the one on the income statement referring to returns and allowances was a reference to note 3. Said note states that "No provision has been made for any adjustments since June 30, 1954 to the reserve for sales returns and allowances and for bad debts. If these reserves were computed on the same basis as the reserve at June 30, 1954, they would be substantially higher." Plaintiff's request for an examination of the books and records of the two corporations by an independent accountant of its choosing having been acceded to, they were examined by a corps of accountants approximated at between 6 and 8 for a period of between one and a half to two weeks. Following completion of the investigation further conferences were held among the principals which eventuated in an interchange of two additional letter-agreements dated August 4, 1955 and August 12, 1955, respectively. The August 4, 1955 agreement recites in part, "[t]his confirms the fact that subject to the various changes we have made * * * in the purchase price and methods of payment, we are advising you that we are buying your companies * * *. This is * * * of course subject to your [sic] and your counsel giving us the various representations on the balance sheet and income statement which you agreed to verbally the other day." The letter did not specify the various changes in the purchase price and methods of payments which had been agreed upon, but there is no dispute that the purchase

---

3. Power Products, Inc. and Champion Implements Corporation will be referred to as "the two corporations".

4. The two statements, schedules and the notes attached thereto will be referred to as the "May 31, 1955 Statements".

5. All figures will be rounded off to nearest $500.

price was revised from $1,000,000 to $765,000 and the mode of payment, from cash to stock in plaintiff corporation. The agreement of August 12, 1955 confirmed "the final arrangements which [had] been made between [the parties] for the purchase of all of the stock of [the two corporations] which [defendant owned]." It then provides in pertinent part: "It is understood that you [the defendant] as sole owner of said stock have agreed to sell and we [the plaintiff] have agreed to purchase * * * as follows: 1. 412,500 shares of C & C Super Corporation stock which you agree that you are taking for investment and not for distribution. * * * All of the other details which we have gone over in person concerning * * * the other representations you have agreed to make, have been agreed upon in detail and remain the same. 2. * * * the closing will take place as soon as possible within one week's time or as soon thereafter as your accountants advise us that the companies' tax returns for the fiscal years ended June 30, 1955 have been filed." In accordance with the apparent intent of the parties that their understanding be memorialized in a more formal document a draft was prepared by plaintiff's counsel and submitted to the attorneys for the defendant. The agreement [6] executed by the parties differs materially from the draft. Whereas the draft contained an unqualified representation that the balance sheets annexed thereto fairly represented the financial condition of the two corporations, in the contract the representation was watered down by significant exceptions. Only two of those exceptions concern us now. They appear in subdivisions numbered (3) and (4) of paragraph B of the preamble and read thusly: "Newmark warrants and represents to C & C as follows: * * * B. The consolidated statement of assets and liabilities of Power and Champion as of June 30, 1955, which statement is hereto annexed as Exhibit A, fairly and truly presents the consoli-

dated financial position of Power and Champion as of such date, except for the following: * * * (3) Overstatement of the total amount of Accounts Receivable (including C.O.D. Accounts Receivable), as shown in the annexed statement, as compared to the total amount thereof as reflected in the subsidiary accounts or records of the corporations as of June 30th, 1955, not in excess of $5,-000 in the aggregate. (4) Understatement or omission of reserve for bad debts and understatement or omission of reserve for sales returns and allowances."

The contract obligated plaintiff to deliver the 413,500 shares of its common stock to defendant as soon as they had been listed on the American and other specified Stock Exchanges, but in no event later than twenty days from the execution of the contract, and to proceed "forthwith" with effectuating the listings. The listing application was approved by the American Stock Exchange on December 13, 1955. Submitted therewith and included in the application as printed were financial statements of the plaintiff as of September 30, 1955 and of the two corporations as of August 31, 1955.

The statements of the two corporations consolidated, disclose that the liabilities exceed the assets by $100,500; that against accounts receivable of $756,000, there was a reserve for doubtful accounts and sales returns of $272,000—approximately 36%; that for the two months period ending August 31, 1955 Power Products, Inc., one of the two corporations, sustained a net loss of $39,500 before non-recurring charges and federal income tax, and Champion Implements Corp., the other of the two corporations, realized a net profit for the same two months period of $13,000 before provision for federal income taxes; that the gross sales of Power for said two month period totalled $410,000, the returns and allowances $104,500 and the provision for doubtful accounts $36,000. These finan-

6. The agreement bears date August 19, 1955. It will be referred to simply as the contract.

cial statements were in the possession of the plaintiff sometime in the latter part of August or early part of September, 1955 and as already indicated, were filed by it with the American Stock Exchange in December, 1955 as part of its listing application.

The defendant asserts that because of the large volume of business in the months of April, May and June, 1955 and "the tremendous number of entries required to be made, approximately $100,000 of returns had not been noted and had not been deducted from the accounts receivable" as shown on the balance sheet as of June 30, 1955 attached to the contract and that promptly after he learned of the returns, to wit, on August 29, 1955, he had a meeting with the responsible officers of plaintiff and called the matter to their attention. It is not denied that the meeting was held and that the defendant imparted some information with respect to sales returns. The parties seem to differ as to whether defendant said the unrecorded sales returns amounted to about $100,000, or to about $75,000. Plaintiff charges, however, that the defendant did not disclose at that time that the amount of the unrecorded returns had not been deducted from the stated amount of accounts receivable and it "did not know therefore that the amount of accounts receivable had been overstated by that amount. This", plaintiff further charges, "amounted to a deliberate concealment of the truth since, in the course of the usual accounting practices as soon as merchandise is returned, the accounts receivable are debited by the amount of the sales returned."[7] Besides being obviously in error—accounts receivable to correctly reflect diminution by reason of returns is to be credited, not debited—this contention is difficult to follow. To one not versed in accounting, information that sales which had been charged to accounts receivable had been returned and the return not reflected on the books of account might not convey that the accounts receivable are overstated to the extent of

the unrecorded returned sales. But here the affiant tells us of his own knowledge that it is usual accounting practice to adjust the accounts receivable as soon as merchandise is returned by the amount of the return, and also that he was informed that a substantial amount of returned sales had not been recorded. It is difficult to perceive how this information in the hands of one who expresses an opinion on usual accounting practices did less than indicate to him that the other portion of the entry, *i. e.*, the crediting of accounts receivable, required to record the sales return in a double entry set of books, likewise had not been made. An intimation that this information, in the light of the circumstances here, would not, at the very least, prompt an inquiry into whether the accounts receivable had been reduced by the unrecorded returned sales, taxes credulity.

After consummation of the transaction the two corporations were merged into plaintiff and their operations continued as the Power Products Division. Under date of March 7, 1956 plaintiff's treasurer and comptroller jointly submitted a report, entitled "Power Products Division—Special Study of Operations", in which they pointed out that the Power Products Division has many features unique only to that particular division of the plaintiff. The alleged unique features are listed and discussed at length. Under the subject of "Sales and Return Sales" comment is made on the increase of 19% in the ratio of returns to gross sales (installment) during the period August 1, 1955 to December 31, 1955 over that during the period July 1, 1954 to August 31, 1955. The Reserve for Bad Debts is reviewed extensively. The authors point out that "the origin of a substantial reserve for bad debts came about during the preparation of the * * * report of [defendant's accountants] Sheppard, Rosenthal & Coburn [sic] of August 31, 1955"—the financial statements which were made part of the listing application heretofore referred to— and that prior thereto "no provision of

---

7. Quotation from affidavit of Charles F. O'Brien, Treasurer of plaintiff.

any great extent had been made because no study had ever been performed to ascertain the true reserve account for bad debts". They then explain the procedure employed by said firm of accountants which "gave them the amount of dollars we could expect to lose due to non-payment." The loss on accounts receivable which resulted from sales during the period August 1953 to December 31, 1954 was estimated at $103,000 which amounted to 15.8% of net installment sales during that period. The accountants then applied the 16% (15.8% rounded off) to the net installment sales for the period August 1953 to August 31, 1955 "and developed the expected bad loss. Per the schedule [which is attached to the study] this figure, $300,685, is 16% of all installment sales for the period 8/53 to 8/55 of $1,879,282. During the period 8/53–8/55 $44,371 of accounts receivable were written off, making the net reserve figure $256,313 and when this is compared to the Accounts Receivable on hand as of 8/31/55 ($750,-645), the percentage is 34.1%". The authors of the survey stated several conclusions, one of them being that the reserve for bad debts appeared adequate as of December 31, 1955.

With the May 31, 1955 statements, the statements as of August 31, 1955 which it incorporated in the listing application and the special study made by its own financial officers under date of March 7, 1956 before it, plaintiff took no steps to rescind the transaction, or seek any other relief until October 19, 1956. This conduct, viewed in the light of the fact that the written statements furnished by the defendant and the contract itself are completely devoid of any representations relating to the ratio between bad debts and sales, and all the other surrounding circumstances, nubilates the minimal showing of probable success by the plaintiff on the trial that would be required to entitle it to the drastic remedy afforded by a temporary injunction. See American Visuals Corporation v. Holland, 2 Cir., 1955, 219 F.

2d 223; Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738.

The suggestion of irreparable injury to plaintiff is essentially an apprehension as to defendant's ability to respond to a judgment. Plaintiff has come forward with nothing that rises to the dignity of proof to demonstrate that its concern on this score is well grounded.

Plaintiff did not apply to the court for an injunction pendente lite. It obtained all the relief such an injunction would afford by the simple expedient of instructing the transfer agent for its common stock to cease transferring shares out of the name of the defendant. An attempt is made to justify this action on a variety of grounds in addition to those already discussed. Defendant is alleged to have said that if plaintiff took any action of any kind against him he would immediately "dump" his shares on the market and thereby force down the market price to 10 cents a share or even lower. He is alleged to have further stated that he knew that many stockholders held stock on margin or had otherwise pledged it as collateral and that his action would damage such stockholders as well as the company. At the time this threat is supposed to have been uttered the stock was being traded on the American Stock Exchange at about $1.25 per share, and the defendant owned approximately 280,000 shares. The market value of his holdings was thus around $350,-000. Surely, if defendant did make the statements ascribed to him plaintiff could not have taken them seriously, for not even plaintiff portrays defendant as sufficiently affluent to throw away upwards of $300,000, just to indulge his spitefulness. Further, defendant's sales of over 100,000 shares made subsequent to the alleged conversation without any apparent depressing effect on the market, demonstrate the illusory nature of the fears expressed by plaintiff.

Complaint is made that defendant, as a director of plaintiff, owed it a duty not to sell his stock to third parties without giving it the "first refusal". We need

not examine into the factual or legal merits of this contention, because it is not urged that if it had been offered first refusal it would have purchased the stock sold by the defendant.

In its brief plaintiff contents itself with repeating a statement contained in one of the affidavits submitted on the motion to the effect that the defendant had delivered a letter stating that he was acquiring the stock for investment and not for distribution.[8] The significance of this statement is not apparent since it is not alleged in the complaint that the letter was false when delivered.

In its effort to justify the self help it has resorted to, plaintiff reaches out for matters which are at issue in another suit pending against defendant's daughter and son-in-law and in an arbitration proceeding under defendant's employment contract. It is sufficient to observe that they have no bearing in the instant suit.

The final contention of plaintiff is that defendant has an adequate remedy at law, presumably for damages measured by the difference, if any, between the market value of the stock on the day when transfer was refused and when, if ever, the impropriety thereof has been judicially established. It is an inappropriate measure of compensation for involuntary retention of the stock since such relief obviously may not make the defendant whole. The damages flowing from the interference with his right to sell and reinvest the proceeds in other securities or ventures which might prove more rewarding would not be readily ascertainable. A holder of stock who bears no legal obligation to refrain from disposing thereof should not, by exercise of a power not sanctioned in law, be compelled to retain his holdings.

Defendant's motion to enjoin plaintiff from restricting the transfer of any of his stock is granted. Submit order.

8. The purpose of this letter was to evidence that the issuance of the shares to defendant pursuant to the contract con-

stituted an exempted transaction under sec. 4(1) of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77d.