The **LUNKENHEIMER COMPANY,**
Plaintiff,

v.

**CONDEC CORP., Conval Corp., Norman
I. Schafter and Georgeson
& Co., Defendants.**

No. 67 Civ. 1603.

United States District Court
S. D. New York.

May 5, 1967.

Shearman & Sterling, New York City, for plaintiff; Paul B. Coffey, New York City, of counsel.

Hays, Algase, Feuer, Porter & Spanier, New York City, for defendants; Mortimer Feuer, Kaye, Scholer, Fierman, Hays & Handler, New York City, Milton Handler, David Klingsberg, Leonard Orland and Michael Malina, New York City, of counsel.

FRANKEL, District Judge.

This is an action under Section 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act to enjoin an attempt by defendant Condec Corporation to acquire a controlling stock interest in plaintiff, The Lunkenheimer Company. (There is also a damage claim and there are other defendants, but it is not necessary for present purposes to consider these additional factors.) Simultaneously with the filing of the action, by order to show cause dated April 24, 1967, and returnable May 1, 1967, the plaintiff brought on the motion for a preliminary injunction which is now before the court for decision.

As I shall mention more fully later on, the situation is such that by May 9, 1967, the positions of the parties will have been irreparably altered, whichever way this motion is decided. Accordingly, the motion has been heard and considered with all inconvenient speed. Counsel presented over the weekend of

May 2 and 3, 1967, an imposing pile of affidavits. The court heard argument on May 1. While it appeared probable that plaintiff would fail on the papers alone, that seemed an unsatisfactory basis on which to dispose of a matter like this. The parties were directed to adduce live evidence on the one or two issues most seriously disputed. The available time made it possible to supply such evidence in only a day and one-half of hearings, ending at mid-day yesterday, May 4.

Then we faced the fact that the normal right of appeal would probably be unavailable as a practical matter because May 9 is so imminent and because that date is likely to be decisive, as both parties agreed. In an effort to mitigate this problem to the extent possible, and after some vacillation by the court, it was concluded that we should not take time for further briefs and the preparation of a formal written opinion. And so we have convened here today for the issuance of this oral statement of the court's findings, conclusions and ruling on the motion.

In light of the circumstances, and at the risk of making everything that comes after this anticlimatic, I start by announcing the court's ruling. For reasons I will outline hereafter, I have concluded that the application for a preliminary injunction must be denied, and I will enter an order denying it.

To set the scene very briefly, the plaintiff is in the business of manufacturing and selling valves. The Hammond Valve Corporation, a wholly owned subsidiary of defendant Condec, also manufactures and sells valves. This is the essential basis, very generally stated, on which plaintiff claims that acquisition of its shares by Condec will violate Section 7 of the Clayton Act—because, as plaintiff argues in the pertinent words of the statute, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

In its initial brief, plaintiff asserted that it had "a reasonable probability of success" after trial, and that this familiar standard justified and required the granting of a preliminary restraint. By May 1, the day of oral argument, plaintiff had retreated to a claim that it had succeeded in raising "serious" or "substantial" questions, and urged that this was enough in a case of this kind to warrant a preliminary injunction. For this view, plaintiff relies heavily on the decision in Hamilton Watch Company v. Benrus Watch Company, 206 F.2d 738 (2d Cir. 1953), and other cases which do, indeed, hold that the presentation of substantial issues may be sufficient, considering all the circumstances of a particular case, to justify a preliminary restraint maintaining the *status quo* until such issues can be tried out and resolved with orderly deliberation. As I have said, however, in the circumstances of this case—where plaintiff's showing on the merits is not an impressive one, and where the effect of a preliminary injunction would be substantially to give plaintiff an ultimate victory—cases like the ones plaintiff cites fail to sustain its position.

Now, to turn to the facts in somewhat greater detail, as they must be gleaned from the hasty and preliminary presentation the parties have been able to make, and to the issues on which the parties are in dispute.

The plaintiff had total sales in 1966 of some $23,000,000. That total is comprised of sales of a broad variety of bronze, iron and steel valves sold nationally through some 400 distributors. The valves plaintiff manufactures may be described generally for our purposes as "industrial." They are rated at 125 lbs. or more "working steam pressure" (W.S.P.). They are used in a variety of industrial installations—the petroleum industry, chemical, textiles and many others—and in the construction of large structures such as office buildings, hospitals, schools and the like. Of plaintiff's total sales, $9,375,000 represent

valves made of bronze. The remainder of plaintiff's sales, with minor exceptions, are of iron and steel valves.

Hammond had total sales in 1966 of $10,600,000. Of this total, $8,400,000 represented sales of non-pressure rated or low-pressure rated valves, i. e., valves designed and rated for pressures below 125 lbs. Such valves are used almost entirely in one- or two-family residential construction, or, less frequently, in small apartment buildings. They have sometimes been referred to in our hearing as "plumbing and heating" valves, and I shall use that loose term to refer to them here. The plaintiff does not make such plumbing and heating valves, and it is clear that there is no real competition between plaintiff and Hammond with respect to this major portion of Hammond's business. About 3 years ago, however, Hammond embarked on the production of industrial valves. It has brought out a line much smaller than plaintiff's, but it appears to be growing rapidly in this area. Its sales of industrial valves in 1966 totalled $2,300,000. Some of this total represents iron valves, but the record, unless I have overlooked something, does not show how much. I shall assume in plaintiff's favor that all of the $2,300,000 of Hammond's industrial valve sales is comprised of sales of bronze products.

This brings us to the central subject on which the parties have presented conflicting evidence and argument. The plaintiff contends that the relevant market or (in the language of the Clayton Act, Section 7) "line of commerce"—a matter which must be determined as a basic threshold proposition in such a case—should be defined as the "general bronze valve market." This broad definition would cover, evidently, both the so-called "industrials" and the "plumbing and heating" valves to which I have referred. Alternatively, plaintiff urges that the relevant market be taken as covering industrial valves made of bronze, as distinguished from industrial valves made of other metals like iron and steel.

The defendants argue, on the other hand, that the general terrain of all bronze valves cannot rationally be deemed a "market" in any apposite sense. The field of plumbing and heating valves, in defendants' submission, is patently distinct and separate. Furthermore, defendants say it is absurd, unrealistic and legally unacceptable to carve from the field of industrial valves those made of bronze and deem them to comprise a separate "market."

In addition to the foregoing issues as to market definition, the parties, the papers, and the live testimony are in sharp disagreement as to the relevant amounts of national sales, whichever way the market is defined. Not surprisingly, the total figures proposed by plaintiff are much smaller than those defendants present, so that the asserted market shares of the plaintiff and Hammond are substantially larger in plaintiff's view than they are in defendants'.

These issues as to market definition and total sales might not be dispositive of this motion no matter how they were resolved. But I will consider them before turning to the other aspects of the case that seem to me to require the ruling adverse to the plaintiff.

First, I reject with reasonable confidence, even on the meager information before me, plaintiff's notion of a "general bronze valve market." The category of plumbing and heating valves is designed for obviously distinct uses, is produced largely by a separate (though overlapping) group of manufacturers, is sold through different distribution channels, and is substantially not interchangeable with valves in the "industrial" category. The evidence before me indicates that there are no significant price interrelationships between plumbing and heating valves and industrial valves. The production facilities used for the two types of valves are distinct and dissimilar, with much more sophisticated technology and larger investment required for industrial valves.

I turn then to the question, which was the subject of more serious contest as

the proceeding developed, whether industrial valves made of bronze comprise a separate market, distinct from industrial valves made of iron and steel. On this, there is much to be said for defendants' view. The evidence before me shows that the same manufacturers commonly—and as a matter of economic necessity—produce valves of iron and steel along with bronze valves. There is a substantial measure of interchangeability among the valves made of the three kinds of metal. The distribution channels tend generally to be the same, as are the end users as well as uses. The statistical records compiled by the Census Bureau do not make the separation of bronze valves for which plaintiff contends. If it were appropriate to decide this question now on a preponderance of the evidence, I would rule in defendants' favor. The result, as plaintiff does not appear seriously to dispute, would be to produce a relatively minuscule market share for the plaintiff and an entirely negligible share for Hammond.

However, there are arguments of substance for the contention that bronze industrial valves should be deemed to constitute a separate market. Valves made of bronze have special properties —high corrosion resistance, superior stability in sudden temperature changes, and less susceptibility to breakage upon impact than iron. Plaintiff quotes one or two public statements in which Hammond's president, or defendant Condec, has made reference to "the bronze valve market." These, in their context, are not of enormous significance, but they may be taken as some evidence for plaintiff's view.[1] The Valve Manufacturers Association, comprised of only some 23 companies in the field (not including so substantial a company as plaintiff, which

was formerly, but is no longer, a member), compiles statistics in which it reports separately "iron body valves," "bronze valves," and "cast steel valves," as well as others.

Assuming, then, that plaintiff has made a substantial showing that there exists in a meaningful sense a "bronze industrial valve market"—without deciding (because it is not ultimately decisive in my view) whether plaintiff has demonstrated a reasonable probability of success on this issue—I come to the contested subject of market figures. On this both the affidavits and the live testimony are in vivid dispute. Having studied the papers and listened to the witnesses, I find that the testimony for defendants on this subject—given by Morris R. Beschloss, President of Hammond—is much more cogent, knowledgeable, internally consistent and persuasive than that adduced on behalf of plaintiff. Plaintiff relied on a set of partial sampling figures prepared by the Valve Manufacturers Association to construct its estimate of the total market in bronze industrial valves. This presentation was supplemented by testimony from plaintiff's top executive and high executives of two of plaintiff's competitors. Their testimony turned out to be little more than an uncritical acceptance of the Valve Manufacturers Association statistics combined with vague and unimpressive guesses to suggest that the statistics portrayed the full picture.

On plaintiff's view, the total market for bronze industrial valves amounts to $100,000,000 to $120,000,000 in annual sales. If this view were accepted, plaintiff's share of that alleged market would approach 10 per cent while that of Hammond would be in the vicinity of 2 per cent, adding to the appreciable total of something like 12 per cent.

[1.] Hammond initially entered the industrial field with only bronze valves. It discovered that it was necessary, in order to compete effectively, to offer a line that included iron industrial valves, as is the case with plaintiff and other established companies in the field. The statements plaintiff cites—referring variously to "the iron valve market," "the bronze valve market," and "the industrial valve business"—decline in significance when viewed against the specific developments to which the statements had reference when they were made.

Defendants' evidence, on the other hand, built by extrapolations from presumably objective and relatively complete federal Census figures, indicates a "bronze industrial valve market" in which total sales approach the sum of $300,000,000. Defendants' witness candidly acknowledged that this estimate could not be given with anything approaching certainty. Nevertheless, considering all the evidence, I find the estimate a more realistic and persuasive approximation than that given on behalf of the plaintiff. Taking the $300,000,000 figure, plaintiff's market share declines to about 3 per cent and Hammond's to less than 1 per cent. Recognizing that this calculation contains a substantial possibility of error, I find that the pertinent figure, so far as the inadequate evidence permits the court to guess at it, is well in excess of $200,000,000, and that the market shares of plaintiff and Hammond combined do not in all probability exceed 5 per cent at a maximum.

In the end, the bare figures on market shares are substantially all plaintiff offers in support of its view that it can ultimately show a violation of Section 7. There is no claim that the industry, however it is defined, is one in which there is high concentration, or a tendency toward concentration. Such evidence as the Court has been given points to a contrary conclusion. Thus, this case is sharply distinguishable from cases like United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) and United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), where impressive facts of accelerating concentration played central roles in the decisions. Similarly, there is no showing here—except for vague, conclusory and essentially weightless testimony for plaintiff as contrasted with opposed and more persuasive testimony for defendants—that we are concerned with an industry where there are high barriers to the entry of new competitors and new competition.

Thus, I find there is merit in defendants' argument that plaintiff is arguing for an unprecedented and (thus far at least) unacceptable view that there is a *per se* violation merely on a showing that the proposed acquisition effects a horizontal combination.

I should also note that there is a suggestion by plaintiff that it may derive some support from the decision in Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303, decided by the Supreme Court on April 11, 1967, involving what was deemed to be appropriately described as a "product-extension merger." For purposes of this speedy opinion, it is enough to say that *Procter & Gamble* is eminently distinguishable. The Court there emphasized the factor of high concentration in the industry, in which the defendant had absorbed the major company. The acquiring company was a huge power, with enormous leverage in the acquired company's closely related area. There are no comparable factors here. Indeed, as I shall mention again later on, this secondary argument for plaintiff is very severely diminished by the fact that plaintiff's opposition to the acquisition by defendants is predicated ultimately on the desire of plaintiff's management to have the plaintiff absorbed by a much larger and much more powerful company which is waiting in the wings for plaintiff to prevail in this action.

At this point, in considering the merits of plaintiff's claim, I should note one interesting and unusual factor that emerged from the live hearing in the last two days. From the testimony of plaintiff's chief executive officer and a top executive of one of its competitors, it appeared that those with relative power in the valve industry prefer a gentlemanly set-up in which competition ought to be pressed in terms of quality, service, and reputation rather than price. One of plaintiff's competitors, through its executive, is reported to have "shuddered" when it heard reports that Hammond might be acquiring the plaintiff. The tremors are said explicitly to have been caused by a belief that Hammond has a

disposition to compete by "undercutting" the prices of other manufacturers. There is a strong suggestion, in short, that the opposition to defendants is not necessarily predicated on the threat that they will "lessen" competition, "substantially" or otherwise, but that they may well intensify it through methods that are traditionally favored though the plaintiff and others sharing its views are hostile to them.

To summarize what I have said thus far, from the showing that has been made on this preliminary application, I conclude that plaintiff will or would probably lose this case in the end. In the familiar words, it has not shown the "reasonable probability of success" it forecast at the outset.

But this has been a frustratingly short proceeding. The nature of the subject matter is such that a confident decision on the merits would require a careful and detailed study "of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case." Brown Shoe Co. v. United States, 370 U.S. 294, 322 n. 38, 82 S.Ct. 1502, 1522, 8 L.Ed.2d 510 (1962). And so there is surface appeal in plaintiff's claim that a temporary injunction should issue—only to preserve the *status quo*, as plaintiff argues—until plaintiff has time to marshal and present its whole case for a final injunction.

But the fact is, as I have indicated, that a temporary injunction would not preserve the *status quo*. It would win the case for plaintiff. And the delay that brings us to this state of crisis is all attributable to the plaintiff, which could and should have been in court long ago if it wanted the relief it now seeks. Plaintiff has known since early February that Condec was seeking vigorously to acquire the controlling interest now at stake. Plaintiff's management has fought that effort with vigor from the beginning—by appeals to plaintiff's stockholders, litigation, and other measures. It never suggested until now that there were antitrust objections to the acquisition. Whether this is because the antitrust angle is an afterthought or because of other things is not a prime question (though it is not uninteresting) at this point.[2] What matters is that under cases it now cites—or without the citation of cases—plaintiff could have been in court well before it arrived. See, e. g., Vanadium Corp. of America v. Susquehanna Corporation, 203 F.Supp. 686, 696 (D.Del.1962).

Condec's first offer for the stock, in February, ended without success. But Condec did not give up, and plaintiff knew fully that it was not giving up. Condec formulated an improved offer. Since this proposal was to include Condec stock as well as cash, it required a registration statement approved by the S.E.C. On March 30, Condec wired to plaintiff a request that it review, at Condec's expense, a proposed portion of the prospectus, taken from an earlier prospectus issued by plaintiff, describing the plaintiff's nature and condition. On April 3, plaintiff was informed by Condec that the latter's registration statement would be filed, and Condec demanded an up-to-date stockholders list for use in communicating its new offer. Again, plaintiff resisted the demand for the list, and the parties found themselves again in the Delaware Court on Condec's mandamus application. This time, however, plaintiff agreed, in its answer filed about mid-April, to supply the list upon an order limiting its use to "proper purposes." Again, nothing was said about antitrust.

The Condec registration statement became effective Friday, April 21, 1967,

---

2. Plaintiff opposed unsuccessfully in the Delaware Superior Court a demand by Condec to inspect its list of stockholders. It tendered five affirmative defenses charging "improper purpose," including alleged threats of violations by Condec of the Securities Exchange Act of 1934. Theatened violation of the antitrust laws would obviously have been a pertinent consideration. It was not raised.

and was mailed on the ensuing weekend to reach plaintiff's stockholders on April 24 or thereabouts. On the latter date, it will be recalled, plaintiff got around to bringing its suit and motion for a preliminary injunction. Condec's tender offer, as approved by the S.E.C., terminates May 4, but may be extended by Condec to a date no later than May 9, 1967. If there were nothing more to the picture, there would be great weight in defendants' contention that having failed with a prior offer, Condec would probably face insurmountable resistance (leaving aside the expense and trouble it has borne) to a later effort to go back to plaintiff's stockholders if it is barred from carrying through on the outstanding tender offer. But there is considerably more to the picture.

On March 8, 1967, plaintiff's Board of Directors executed a contract with Textron, Inc., subject to the approval of plaintiff's stockholders, for the sale of plaintiff's assets to Textron. The stockholders' meeting to vote on the contract is set for May 10, 1967. Thus, the obvious objective of plaintiff in this tardy suit was to block defendants by "preliminary" relief and proceed to sell out to Textron, a course preferred by plaintiff's management but not one presenting any profoundly impressive advantages for the stockholders.

In such circumstances, the plea for maintenance of the *status quo* rings false. The *Hamilton Watch* case, upon which plaintiff relies, was premised upon the notion of freezing a situation before injury, to leave time for mature adjudication. What Judge Frank said there, underscoring what becomes highly significant here, was:

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; *if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff)*, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." 206 F.2d at 740.

And he went on to spell out the pertinent notion of a temporary injunction as a device for postponing (not doing) injury:

"[A] preliminary injunction—as indicated by the numerous more or less synonymous adjectives used to label it—is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness. It serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began." Id. at 742.

Those conceptions have no application to what plaintiff has attempted here. Plaintiff came to court at the last possible moment, tendering excuses too lame to recount in this hasty opinion, to achieve a final victory. Even apart from plaintiff's weak showing on the merits, a court asked for equitable relief ought to dismiss such a suitor. Cf., e. g., Blaich v. National Football League, 212 F.Supp. 319 (S.D.N.Y.1962).

When the inequity in plaintiff's position was exposed upon argument, counsel for plaintiff reluctantly acceded to the Court's suggestion that the Textron deal might be adjourned. The talk was in terms of a couple of weeks. It may be assumed that such an arrangement could be enforced by the court.[3] But upon reflection as mature as permitted by the haste plaintiff sought, I conclude that this is no solution. For one thing, it could not cure the injury to defendants. Furthermore, the plot as to Textron is

---

3. Whether Textron would stand by for a postponement could not be told by counsel or anyone here. In the ultimate view taken of this problem, it does not matter.

still thicker; there are strong indications that plaintiff has not been strenuously candid with the Court on this subject.

The moving papers, while urging that defendants be blocked so that plaintiff can sell out to Textron, are notably uninformative about the latter company. The complaint (par. 27) alleges:

"Textron, Inc. does not compete with plaintiff and is not in the valve business, but plans to operate Lunkenheimer as a vigorous competitor in the valve market, following its acquisition of Lunkenheimer's assets."

Plaintiff tendered no proof of these assertions. Defendants put in some interesting and uncontradicted, if by no means conclusive, evidence suggesting contrary possibilities.

Textron, at least in terms of sales, is over twenty times the size of Condec. Textron already makes some valves. It has recently acquired a valve manufacturer through which it will be making more. It makes iron castings of a kind plaintiff uses in manufacturing valves. It purchases through its various divisions valves of the kind plaintiff produces.

There are, in short, sharp, if only slightly explored, indications that the Textron acquisition so zealously sought by plaintiff's management has graver antitrust implications—horizontal, vertical, conglomerate, and "product-extension"—than the acquisition the Court is asked to enjoin. To be sure, the implications could be obliterated some day in the full trial which has proved impossible. But they are here now. They are enough, at least, to sap further what is already a weak case. They are surely of some weight adverse to plaintiff when we recall that "[i]t is competition, not competitors, which the Act protects." Brown Shoe Co. v. United States, 370 U.S. 294, 344, 82 S.Ct. 1502, 1534, 8 L.Ed. 2d 510 (1962).

Given the disquieting posture of the Textron question, together with the circumstances already reviewed, the case is powerful against intervention by the Court to vote with plaintiff's manage-

ment that the Textron takeover is somehow better and less anticompetitive than Condec's. While unscrambling is never wholly satisfactory, it is a relevant source of some comfort that the Department of Justice and the Federal Trade Commission, more detached than those who control plaintiff, remain available to scrutinize the problem and take steps if defendants' acquisition should seem more baleful than now appears.

 For the reasons stated, the Court will deny the preliminary injunction and dissolve the informal stay heretofore agreed upon by both sides.