Louis R. BLAICH, Thomas O'Connell, Jr., and Peter Sibell, Plaintiffs,

v.

The NATIONAL FOOTBALL LEAGUE, New York Football Giants, Inc. and National Broadcasting Company, Inc., Defendants.

United States District Court
S. D. New York.
Dec. 28, 1962.

Molloy & Fletcher, Manhasset, N. Y., James H. Fletcher, Manhasset, N. Y., of counsel, for plaintiffs.

Royall, Koegel & Rogers, New York City, John A. Wells, Stanley Godofsky, Eugene T. Rossides, New York City, of counsel, for defendant, National Football League.

Townley, Updike, Carter & Rodgers, New York City, John R. Schoemer, Jr., New York City, of counsel, for defendant, New York Football Giants, Inc.

Cahill, Gordon, Reindel & Ohl, New York City, Robert G. Zeller, Constantine N. Katsoris, New York City, of counsel, for defendant, National Broadcasting Co., Inc.

WEINFELD, District Judge.

The plaintiffs seek a preliminary injunction which, in effect, would require the National Broadcasting Company to disregard a provision in its contract with the National Football League, whereby the Broadcasting Company agreed to exclude from the national telecasting of the League championship game, a seventy-five mile radius of Yankee Stadium, New York, the site of the game, scheduled for this Sunday, December 30, 1962. Stated differently, the plaintiffs seek a mandatory injunction to compel the defendants to lift a so-called blackout [1] of the game on television over a seventy-five mile radius within the Metropolitan area. If the motion is granted, the plaintiffs will receive the full measure of relief to which normally they would be entitled only after a trial on the merits and then only if they sustained the burden of their claims. To achieve this extraordinary and drastic remedy in advance of the trial, where all the contested issues could be fully explored, the plaintiffs must show a clear right to relief and that irreparable injury will result if their motion is denied.[2]

The plaintiffs have no contractual or other relationship with the Football League, the Football Team or the Broadcasting Company, the defendants herein. The essence of their position is that the provision in the exclusive broadcasting contract between the League and the Broadcasting Company, "no TV station may carry the game if its signal goes into the territory (75 miles) of the home club where the game is being played," violates the antitrust laws as an unreasonable restraint upon interstate commerce and trade and deprives them, the plaintiffs, of a valuable property right without due process of law.

The defendants contend that the agreement has express Congressional sanction as a specific exception to the antitrust laws; that even if it did not come within the exception, it does not offend the antitrust laws; and, in any event, there is no showing of irreparable injury; and further that plaintiffs have no standing to sue and their inordinate delay in asserting any claim until the

---

1. Upon the argument, attorneys representing the various defendants challenged the use by plaintiffs of the term "blackout." The fact is that it has been judicially so described in United States v. National Football League, 116 F.Supp. 319, 325 (E.D.Pa.1953). The use of the term in this opinion is not intended in any invidious sense.

2. Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214 (2d Cir. 1953); Hall Signal Co. v. General Ry. Signal Co., 153 F. 907 (2d Cir. 1907); American TCP Corp. v. Shell Oil Co., 123 F.Supp. 55, 57 (S.D.N.Y.1954); Anderson-Friberg, Inc. v. Justin R. Clary & Son, Inc., 98 F.Supp. 75, 82 (S.D.N.Y.1951).

very eve of the championship game fore-closes injunctive relief.

## PLAINTIFFS' CLAIMED RIGHT TO RELIEF

The exclusion of home territory of a home team from live telecasts of its game is grounded in economic necessity. In the single case where the issue was tried it was found that unless such a blackout policy was in force, gate receipts would be substantially reduced and as a result League teams and the League itself would be adversely affected. The Court there stated:

> "Reasonable protection of home game attendance is essential to the very existence of the individual clubs, without which there can be no League and no professional football as we know it today." [3]

In that case, decided in 1953, the Court permitted contracts to restrict the telecasting of games into a member club's home territory when that team was playing at home, but prohibited other restrictive practices engaged in by the League and its officials. Some years later, in 1961, the District Court, in construing its earlier judgment, held that it prohibited a league, such as the National Football League, from entering into an agreement to sell the *pooled* television rights of its member clubs.[4] Congress, to overcome the effect of this ruling, passed an amendment to the antitrust laws to permit a league to sell to broadcasting companies package deals for the exclusive televising of games of its various teams.[5] The Committee Report which accompanied the bill recognized that should the "weaker teams be allowed to founder, there is danger that the structure of the league would become impaired and its continued operation imperiled." The Committee expressed "the opinion that the public interest in viewing professional league sports warrants some accommodation of antitrust principles and this legislation achieves this purpose with minimal sacrifice of antitrust principles by exempting joint agreements under which a league sells or transfers pooled television rights of its member clubs to a purchaser." [6]

Significantly, the amendment, which became effective September 30, 1961, contains specific authorization to restrict area televising of a game "within the home territory of a member club of the league on a day when such a club is playing a game at home." [7] However, the plaintiffs emphasize that the District Court ruling concerned only regular season games [3] and the legislative history states that the amendment was designed to meet the problems raised by this ruling; [9] accordingly, they argue that the Congressional exemption applies only to regularly scheduled season at-home games. They contend that the reasoning applicable to regular season games has no validity with respect to the National Football League's annual championship games which, according to them, are "invariably completely sold out."

As already noted, section 1291 of Title 15, in general, exempted from antitrust prohibitions joint agreements under which a league sells or transfers pooled television rights of its member clubs to a purchaser. Section 1292 provides that the exemption shall not

3. United States v. National Football League, 116 F.Supp. 319, 325 (E.D.Pa. 1953).

4. United States v. National Football League, 196 F.Supp. 445 (E.D.Pa.1961).

5. 75 Stat. 732 (1961), 15 U.S.C. §§ 1291–1295 (Supp. III, 1959–61).

6. United States Senate, Committee on the Judiciary, S.Rep. No. 1087, 87th Cong., 1st Sess. (1961). Reprinted in U.S.Code & Admin.News p. 3042 (1961).

7. 75 Stat. 732 (1961), 15 U.S.C. § 1292 (Supp. III, 1959–61).

8. United States v. National Football League, 196 F.Supp. 445, 446 n. 2 (E.D. Pa.1961).

9. United States Senate, Committee on the Judiciary, S.Rep. No. 1087, 87th Cong., 1st Sess. (1961). Reprinted in U.S.Code & Admin.News p. 3042 (1961).

extend to any joint agreement which prohibits a purchaser of such telecasting rights from telecasting the games in a particular area "except within the home territory of a member club of the league on a day when such club is playing a game at home." This latter clause expressly permits local area blackouts. It does not specify a pre-season game, a season game, a post-season game or a championship game. It uses the all-embracing term "game." In the face of such clear and unequivocal language there is no basis upon which this Court can reasonably exclude from its authorization the area restriction of a league championship game. To do so in effect would amend the section by adding thereto the words "except a championship game."

Apart from the foregoing Congressional sanction of a local area restriction favoring the defendants' position, the facts do not bear out plaintiffs' assertion that championship games are automatic sellouts. For the years 1950 through 1961, out of a total of thirteen championship and play-off games, ten were not sellouts in greater or lesser degree. Only last year the championship game between the New York Giants and the Green Bay Packers was not sold out and the week before the game tickets were offered at reduced prices. The fact that this year's game is a sellout does not overcome demonstrated experience of earlier years. The right of the League and the football clubs to protect themselves and their players against potential box office loss said to result from local telecasting does not shift with the whim, enthusiasm or lack of enthusiasm of football fans. The rights of the defendants are neither diminished nor enhanced by the fact that Sunday's game is sold out. Thus, even without the aid of the recent amendment, the defendants' position that the restriction is not an unreasonable restraint of trade rests upon a factual base.

Plaintiffs urge that if the Congressional exemption is construed to apply to championship games, then it offends constitutional limitations. These are vaguely defined; neither in their papers nor upon the argument was the alleged violation of claimed constitutional rights spelled out. In general, as this Court understands the plaintiffs' position, it is that the airwaves are public property which have been franchised under Federal laws to the Broadcasting Company on the basis of public interest, convenience and necessity; that once the Broadcasting Company undertakes to telecast a national sports event it must make it available to the general public through all its outlets; and that to blackout an area discriminates against the right of those within the area to see and enjoy the telecast on terms of equality with those who are privileged to view the championship game. Accordingly, plaintiffs assert they are deprived of a valuable property right without due process of law, contrary to the Fifth Amendment of the Federal Constitution. In sum, to quote them, "the deprivation of their right to observe [the telecast] in common with the millions of Americans to whom it is being televised is a violation of a basic human right, guaranteed by the Constitution and the law of the land." While it is unnecessary for the purposes of this motion that the Court consider and pass upon this somewhat nebulous constitutional issue, resting upon an alleged deprivation of a property right without due process of law, nonetheless it is of doubtful validity.

## THE CLAIM OF IRREPARABLE INJURY

Assuming, arguendo, that a legal right is threatened by the blackout, there still remains the question of claimed irreparable injury. Here the Court must weigh the equities which favor or militate against the respective parties in terms of who is likely to suffer the greater injury if the injunction is granted or denied pending a trial of

the issues.[10] The plaintiffs' claim is that if the blackout is not lifted then their right and that of many others to view the championship game will be irretrievably lost, thereby causing them irreparable injury. It is true they will not be able to enjoy the game in the coziness of their homes, but the opportunity to see the televised game is not altogether foreclosed. They may readily view it by travelling a distance of about fifty miles from their homes,[11] as many who are similarly situated have already arranged.[12] Undoubtedly, if they adopt this course, they will be inconvenienced and will incur travel and perhaps other expenses. But inconvenience does not, in and of itself, constitute irreparable injury. Thus, the greatest injury to be visited upon the plaintiffs is inconvenience and an outlay of funds which, if they ultimately succeed upon a trial, is recoverable as damages. And if plaintiffs should decide not to travel to see a telecast, they are in a position to enjoy a play-by-play live radio broadcast in their homes. True, an aural spectacle may not be as satisfactory as a visual presentation, but plaintiffs are not totally deprived of the enjoyment of the game.

The defendants, on the other hand, contend that were the injunction to be granted it would be to their extreme detriment as it would bring about the very adverse economic effects which the restrictive broadcasts were intended to eliminate. They point out that to compel them to lift the area blackout would seriously diminish the sale of box office tickets for future championship games— and the circumstance that the current game is a sellout does not eliminate the need for protection. Their contention is that suspicion in the public mind that a championship game might be televised in the local area of a home team would, in succeeding years, bring into play the same factors which resulted in nonsellouts in earlier years—that sales would be hampered; that many fans would prefer, particularly at times of inclement and cold weather, to view the game at their homes instead of at stadia.

The defendants make the further contention that many fans who bought tickets for the current championship game acquired them as a result of the purchase of season tickets for seven regular home games, which carried an option to buy tickets for the championship game; that if it is known or suspected that the championship game might be televised locally on the day of the home game, then the purchase of regular season tickets, a substantial source of revenue, will be greatly curtailed. Of course, whether or not the dire consequences which defendants envisage will materialize cannot now be determined with certainty, but the concern expressed by the defendants that ticket sales will be impaired in the future bears a degree of plausibility based upon prior experience.

The defendants also face a heavy financial loss if the injunction should be granted so as to ban the telecasting of the game entirely unless the restriction is removed in the local area.[13] To ban it entirely, of course, would mean the loss of almost $600,000 to which the League is entitled from the Broadcasting Company under the terms of their contract. This, at the same time, would deprive millions of fans outside the restricted area from seeing the game. If the form of the injunction directs the

10. See Rice & Adams Corp. v. Lathrop, 278 U.S. 509, 514, 49 S.Ct. 220, 73 L.Ed. 480 (1929); Universal Major Elec. Appliance Corp. v. Universal Major Corp., 138 F.Supp. 745 (S.D.N.Y.1956).

11. Manhasset, where plaintiffs reside, is approximately twenty miles from Yankee Stadium.

12. One enterprising company has arranged a package tour from New York to Philadelphia and return to view the game on television at Philadelphia at a price of $15, to include brunch.

13. Plaintiffs request a complete ban of the telecast anywhere in the United States unless the game is also televised in the local area.

lifting of the local ban, the defendants similarly would face a loss of substantial license fees for the telecast in this area. The contract price for the licensing of the national television rights was fixed in view of the exclusion of the local area. Obviously, the telecast rights within the greater Metropolitan area, the blacked-out area, with a potential audience of millions, has a substantial monetary value for broadcasting purposes. Who at this time is to determine the sum to be paid for the licensing in this area, or are the parties to negotiate at this late hour under the gun of an injunction?

Finally, the defendants also press that many of those who bought tickets for the game did so in the belief that otherwise they would not be able to see it and that to telecast it would constitute a breach of faith with those ticket purchasers.

Thus, the defendants' challenge upon the law and the facts to the plaintiffs' claim to relief cannot be said to be without substance.[14] Upon all the facts, the burden of hardship appears to bear more heavily upon the defendants than upon the plaintiffs; and on the legal issues plaintiffs' right to relief is not altogether clear. While it is true that the likelihood of plaintiffs' ultimate success is not the sole criterion on their motion for a preliminary injunction,[15] the absence of a clear prospect that they will eventually prevail upon the trial is a factor of significance.[16] In sum, the contested issues of law and fact, the lack of a real showing of irreparable injury to the plaintiffs and the balance of hardship require the denial of the motion.[17]

Undoubtedly, plaintiffs and millions of other football fans within the seventy-five mile restricted area eagerly desire to see Sunday's championship game in the comfort and warmth of their homes, but their preferences cannot overcome the right of these defendants, as authorized by Congress, to impose the local area restriction, believing as they do that it serves their economic interest, however ill advised the public may view their policy. However one may view the imposition of the blackout as a matter of public relations, under the Congressional Act the privilege and decision are the defendants'. The Court's function is to decide the motion on the basis of fact and within the framework of the law. If relief from the terms of the statute is warranted in terms of public interest, it must come from the Congress and not from the courts.

The motion for a preliminary injunction is denied.

14. The defendants urge other factors also require denial of the plaintiffs' motion. These are: (1) lack of standing to sue, since they have no unique business or property susceptible of injury differing in character or kind from injury sustained by the public generally, see United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 98 L.Ed. 903 (1954); and (2) that plaintiffs are guilty of laches, since although the broadcasting agreement has been in effect since 1955 and plaintiffs have known from December 2, 1962 the restrictive conditions under which the championship game was to be played, they took no action until the eve of the game, in the meantime permitting the defendants to go forward with a multitude of plans for the telecasting which they now seek to halt. These contentions also present formidable issues.

15. See Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953).

16. See Huber Baking Co. v. Stroehmann Bros. Co., 208 F.2d 464 (2d Cir. 1953).

17. See Anderson-Friberg, Inc. v. Justin R. Clary & Son, Inc., 98 F.Supp. 75 (S.D. N.Y.1951).