**FEDERAL MARITIME COMMISSION and United States of America, Plaintiffs,**

**v.**

**ATLANTIC & GULF/PANAMA CANAL ZONE et al., Defendants.**

United States District Court
S. D. New York.
April 27, 1965.

Robert M. Morgenthau, U. S. Atty., New York City, Louis E. Greco, Atty. in Charge, N. Y. Office, Admiralty & Shipping Section, Dept. of Justice, for plaintiffs, Gilbert S. Fleischer, New York City, H. B. Mutter, Federal Maritime Commission, of counsel.

Casey, Lane & Mittendorf, New York City, for defendants, John R. Mahoney, David Orlin, New York City, of counsel.

TENNEY, District Judge.

On April 7, 1965, plaintiffs Federal Maritime Commission (hereinafter referred to as "Commission") and the United States of America filed their complaint in this Court and, after hearing, obtained a temporary restraining order which restrained defendants from imposing or collecting a ten percent surcharge on ocean shipments carried between United States ports and ports in Latin America, including the Caribbean. The surcharge had been announced by defendants to be effective on April 5, 1965, and was ostensibly imposed as an emergency measure to counteract the effects of port congestion due to the recently-ended longshoremen's strike. Pursuant to the terms and conditions of the dual rate contract (exclusive patronage contract) utilized by defendants, rate charges, under certain specified emergency conditions, may be imposed on thirty days' notice, whereas regular rate increases may be imposed only on ninety days' notice. Defendants' surcharge was imposed on the shorter, thirty-day notice period.

Plaintiffs request issuance of a preliminary injunction "pending answer to and disposition by the Court of this complaint", and thereafter a permanent injunction restraining defendants from putting into effect the surcharge until thirty days after the conclusion of an investigation of said surcharge commenced by plaintiff Commission.

Hearings were held on April 12, 14, 16 and 22, 1965, at which time both sides were afforded full opportunity to present both oral and documentary proof and argue both the law and the facts. Based on the evidence adduced at those hearings, the lack thereof, the affidavits submitted and the memoranda of law, the following are my findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Each of the defendants is a Steamship Conference maintaining offices in New York, New York.

2. The total number of member lines of all of the defendants is eighteen, of which eight are United States flag lines and four are lines of the flag of a country in the defendants' destination areas.

2(a). The United States flag lines are: Alcoa Steamship Company, Inc.; Grace Line, Inc.; Gulf and South America Steamship Company, Inc.; Lykes Bros. Steamship Company, Inc.; United Fruit Company; Moore-McCormack Lines, Inc.; States Marine Lines, Inc., and Sealand.

2(b). The four national flag lines consist of: Compania Sud Americana De Vapores (Chilean Line); Flota Mercante Dominicana (Dominican Steamship Lines); Flota Mercante Grancolombiana, S.A. (Grancolombiana (New York) Inc.); Mariana Mercante Nicaraguense, S. A. (Mamenic Line).

3. The defendant, West Coast South America Northbound Conference, is concerned with ocean transportation from ports in Peru and Chile to Atlantic and Gulf ports of the United States. (T.R. 392.)

4. The defendant, United States Atlantic and Gulf/Jamaica Conference, is concerned with ocean transportation from United States Atlantic and Gulf ports to Jamaica. (T.R. 392.)

5. The defendant, United States Atlantic and Gulf/West Coast of South America conference, is concerned with ocean transportation from United States Atlantic and Gulf ports to the West Coast of South America. (T.R. 392.)

6. All other defendants are concerned with ocean transportation between United States Atlantic & Gulf ports and ports in their respective destination areas in Latin America. They are two-way Conferences and cover both the outward and inward movement of cargo.

7. Each defendant which is concerned with ocean transportation from United States Atlantic and Gulf ports to destination areas in Latin America operates a dual rate contract system in its trade from the United States to Latin America, but no defendant operates a dual rate contract system in its trade from Latin America to the United States, other than the defendant East Coast Colombia Conference, whose dual rate contract system from the east coast of Colombia to the United States is limited to coffee. (T.R. 394.)

8. From 3,000 to 6,000 shippers have signed dual rate contracts with each defendant operating a dual rate contract system. (T.R. 401.)

9. The dual rate contracts of each defendant *inter alia* provide: "If the Merchant has the legal right at the time of shipment to select a carrier for the shipment of any goods subject to this Agreement, whether by the expressed or implied terms of an agreement for the purchase, sale or transfer of such goods, shipment for his own account, operation of law, or otherwise, the Merchant shall select one or more of the Carriers." (Article 2(a) of Exhibits D-1 through D-8); "The Conference shall offer to the Merchant a subscription to its tariffs at a reasonably compensatory price; however, the Merchant shall be bound by all notices accomplished as

aforesaid without regard to whether he subscribes to the Conference Tariff." (Article 9(b) of Exhibits D–1 through D–8); "In the event of any extraordinary conditions not enumerated in Article 10(a), which conditions may unduly impede, obstruct, or delay the obligations of the Carriers, the Carriers may increase any rate or rates affected thereby, in order to meet such conditions; provided, however, that nothing in this Article shall be construed to limit the provisions of Section 18(b) of the Shipping Act, 1916, in regard to the notice provisions of rate changes. The Merchant may, not less than 10 days before increases are to become effective, notify the Carriers that this Agreement shall be suspended insofar as the increases are concerned, as of the effective date of the increases, unless the Carriers shall give notice that such increase or increases have been rescinded and cancelled." (Article 10(c) of Exhibits D–1 through D–8); "Any and every dispute arising out of, or relating to, this Agreement or the breach hereof shall be settled by submission in New York, N. Y., under the laws of the State of New York pursuant to the New York Simplified Procedure for Court Determination of Disputes Act. * * *" (Article 14 of Exhibits D–1 through D–8).

10. Section 18(b) (2) of the Shipping Act, 1916, (46 U.S.C. § 817(b) (2) (Supp.1964), incorporated into the aforementioned dual rate contracts via Article 10(c), provides:

"No change shall be made in rates, charges, classifications, rules or regulations, which results in an increase in cost to the shipper, nor shall any new or initial rate of any common carrier by water in foreign commerce or conference of such carriers be instituted, except by the publication, and filing, as aforesaid, of a new tariff or tariffs which shall become effective not earlier than thirty days after the date of publication and filing thereof with the Commission, and each such tariff or tariffs shall plainly show the changes proposed to be made in the tariff or tariffs then in force and the time when the rates, charges, classifications, rules or regulations as changed are to become effective; * * *."

11. On March 5, 1965, each of the defendant Conferences published in its tariff and filed with the Commission a "Notice to Shippers" which provided in part:

"Because of extraordinary conditions in Atlantic and Gulf ports, resulting from the strike of longshoremen which began January 11, 1965 and still in effect in some ports, this Conference announces that, pursuant to Section 18(b) of the Shipping Act, 1916, and, where applicable, Article 10(c) of the Conferences form of dual rate agreement, a temporary emergency surcharge of 10% will be in effect, commencing April 5, 1965, and expiring not later than October 3, 1965, on all cargo moving to and from all United States ports served by the Conference. The surcharge will apply to all commodities which are subject to contract rates when the rates on such commodities have been in effect for ninety days and to all other commodities when the rates have been in effect for thirty days * * *". (T.R. 416, 418.)

12. After March 5, 1965, the Federal Maritime Commission received 23 complaints from various shippers alleging that the imposition of the surcharge on less than ninety days' notice would result in irreparable harm, including the loss of markets by shippers in the United States who are doing business in Latin America. (T.R. 83.)

13. The defendants acknowledge that they received 26 complaints concerning the surcharge, a number which they consider about average for any rate increase. (T.R. 402.)

14. Subsequent to March 5, 1965, an investigation into the increase was begun by the staff of the Federal Maritime Commission.

15. On March 31, 1965, the Chairman of the Conferences informed the Com-

mission that the imposition of the surcharge was taken pursuant to Article 10(c) of the defendants' dual rate contracts. The Chairman's letter stated in part:

"We very definitely believe that under Article 10(c) we are entitled to recover the expenses and losses which gave rise to the surcharge before the surcharge became effective. In this connection we would observe that while under this Article we are relieved from the giving of a full 90 days' notice, we did give 30 days' notice under Section 18(b) (2) of the Shipping Act even though we might have requested special permission from the Commission to make the surcharge effective on lesser notice." (Par. 12, Complaint.)

16. The Federal Maritime Commission instituted a proceeding dated April 2, 1965, entitled, Docket No. 65–7, In the Matter of Imposition of Surcharge at United States Atlantic and Gulf Ports on Cargo Moving Between said Ports and Latin American Ports, for the purpose of (1) determining whether the imposition of the surcharge may be violative of Sections 15, 16 First, 17 and 18(b) (5) of the Shipping Act; (2) determining whether the longshoremen's strike constitutes an "extraordinary condition" within the contemplation of Article 10 of the Conferences' dual rate contracts; and (3) to afford an opportunity to the protestants to publicly participate in such investigation. (Appendix No. 2 to May Affidavit, Exhibit 4.)

17. On application of the plaintiffs herein, this Court signed a temporary restraining order April 7, 1965, restraining the further collection of the defendants' surcharge after said surcharge went into effect. (See Court's restraining order.)

18. There are approximately 4,000 rate items in the tariff of the defendant, East Coast Columbia Conference, and a total of approximately 24,000 rate items in the tariffs of all of the defendants. (T.R. 414.)

19. The defendants' surcharge was adopted to recoup losses suffered as a result of the strike of longshoremen which began on or about January 11, 1965 and lasted from 33 to 54 days, depending upon the port. (T.R. 325, 327, 342, 427.) The strike involved every port in the United States Atlantic and Gulf coasts. (T.R. 94, 323; Exhibit 5; Exhibit J.)

20. The strike was not anticipated by the defendants' members who thought that they had a firm agreement with the longshore union Dec. 20, 1965, prior to the time the strike began. (T.R. 324, 451.)

21. The defendants' member thought that the strike would be over daily and took none of the usual steps in advance of the strike to reduce their losses, such as laying up, or drydocking vessels, furloughing their crews, and scheduling them to avoid the strike (T.R. 325, 327, 452), and when the strike was finally settled in New York and other North Atlantic ports, it continued at various other ports (T.R. 447, Exhibit 5), causing shippers who ordinarily shipped from struck ports to send cargo to open ports, causing further strain on defendants' pier facilities. (T.R. 359.)

22. The strike caused congestion, variously characterized herein as "some degree of congestion", "different degrees of congestion" up to "severe,, serious, and immense congestion" (T.R. 94, 96, 98, 180, 186, 442, 444, 448–449, 452, 458, Exhibit J, Exhibit K, p. 3–4) and disruption in scheduling ships (T.R. 340, 360, 442–443, 447, 453, 458, Exhibit J, p. 4; Exhibit K, p. 4).

23. At the conclusion of the strike, because of the mass of cargo, stevedoring gangs were overworked and there was a deterioration in their efficiency, (T.R. 334–335, 444–445) and rail and motor carriers embargoed delivery to piers and would not deliver export cargo without a guarantee of immediate unloading at the port, which was impossible. (Exhibit M, p. 3; T.R. 180; Exhibit J, p. 2).

24. In order to attempt to reschedule their vessels following the conclusion of

the strike, the defendants' members sailed many of their vessels without full loads, leaving cargo on the piers. (T.R. 336, 360, 442.)

25. The bunching of defendants' members' vessels, resulting from disruption of schedules, at Latin American ports has caused congestion at such ports (T.R. 336–337) and the defendants' members estimate that it takes approximately six months for schedules to return to normal. (T.R. 338.)

26. The defendants' members lost the following ships' time as a result of the strike. For example, Grace Line lost 298 ship days (T.R. 330); Grancolombiana lost 473 ship days (T.R. 454); Lykes lost 905 ship days (T.R. 471), and West Coast Line lost 147 ship days (Exhibit K, p. 3). Grace Line, Inc. estimates the cost of the strike and the results thereof at between $2,600,000 to $2,800,000, and expects that the cost will increase as a result of congestion in Latin America as other costs become known (T.R. 370, 374, 375, 381); without its subsidy, Grace Line's losses would be even greater (T.R. 377), and Grace Line, which is a member of each defendant (T.R. 350–351) believes that if it is to stay in business, it has to have some prompt way, such as the surcharge, of recovering its losses (T.R. 376). Lykes estimates that the strike cost it $1,800,000 (T.R. 473) in idle ship days. Grancolombiana estimates that the strike cost it $700,000 in idle ship days (T.R. 455, 456).

27. On March 5, 1965, the day the defendants filed and published notice of surcharge, congestion in varying degrees existed in all ports on the United States Atlantic and Gulf coasts (T.R. 94, 180, Exhibit J, p. 2–4; Exhibit K, p. 4), and it is conceded that in New York on or about that date, there was "immense congestion" (T.R. 96); that in some southern ports the strike was not settled until after March 5, 1965 and that in Houston there was "substantial congestion" on or about March 5, 1965 (T.R. 98).

28. Although there is conflict between plaintiffs' and defendants' testimony concerning the availability of bookings, deliveries and congestion, shippers testified to general difficulties in bookings and deliveries up through April 1, 1965 (T.R. 187), and defendants presented testimony that congestion presently exists in Latin America (T.R. 336–337); that berths were unavailable in early April in Houston (T.R. 442); that discharge of ships was very slow in New York in March and April (T.R. 442, Exhibit K, p. 3); that berths were unavailable in Savannah in late March (T.R. 444); that berths were unavailable in Philadelphia (T.R. 444–445); and that on April 16, 1965, a ship had been waiting for seventeen days for a berth at Port Arthur (T.R. 448–449); that in early April berths had been refused in Charleston and Norfolk (T.R. 457); that ships were diverted from New Orleans because of lack of space (T.R. 458); that their piers could not keep up with all of the cargo delivered or received (T.R. 359, 447–448, Exhibit J, p. 1–2); that to attempt to set up a schedule, vessels unloaded cargo at ports other than that for which it was destined (Exhibit J, p. 2); that, for the same reason, their ships sailed light (T.R. 360, 445, 458); that there were substantial delays at ports in loading and discharging (Exhibit J, p. 2–3); that on April 14, 1965, an abnormal number of longshore gangs were working at various piers in Manhattan and Brooklyn (Exhibit M, p. 3).

29. The affidavits submitted by plaintiffs from various Port Authorities, but by no means all Atlantic and Gulf ports, indicated that congestion has been improving since March 5, 1965, but state either directly or by implication that there was congestion on that date (Exhibits 8 through 16). The affidavit of the Director of Ports of the Board of Commissioners of the Port of New Orleans, dated April 9, 1965, estimates that it would be another two or three weeks before New Orleans is back to normal operations (Exhibit 13). Affidavits of various freight forwarders with regard to the conditions at the Port of New York, although they state that there has

been an improvement in conditions, concede that conditions in New York following the termination of the strike were "extraordinary" and "chaotic". (Exhibits 20 through 22.)

30. Defendants expect that because of bunching of ships congestion will increase again in Atlantic and Gulf ports (T.R. 443, 447, 469–470, 472; Exhibit M, p. 3–4).

31. Although there is a sharp difference between shippers and defendants as to the amount of non-conference service available in the trades (see, for example, T.R. 119–120, 196, 212, as compared with T.R. 351–352–353, 404–405, including references to list at T.R. 89–92), the defendants listed eighteen non-conference lines which are conceded to operate in the defendants' areas (T.R. 89–94), and they claim that at least one other non-conference carrier which they named also operates in their area (T.R. 405).

32. Dual rate contract shippers will ship via non-conference lines if requested to do so by their consignees in Latin America (T.R. 200, 226, 235, 366).

33. Although the defendants' daily business is to deal with specific shipper requests for rate changes, no shipper, including all of those who testified or submitted affidavits in support of the application for injunction, has made any request to defendants for a reduction in rate on any specific shipment (T.R. 419–420).

34. Only one shipper availed itself of the right, under Article 10(c) of the defendants' dual rate contracts, to suspend its contractual obligations with the defendants because of the surcharge (T.R. 401).

35. Approximately one year ago the defendant, Atlantic and Gulf/West Coast of South America Conference, imposed a surcharge, on 30 days' notice, on the port of Callao, Peru, without the imposition of sanctions from the Federal Maritime Commission (T.R. 412, 435–436).

36. Although some shippers claimed that there would be difficulty in Latin America in amending import licenses, it was conceded that in many countries there was a leeway of 5% in the overall value of the goods, including freight (T.R. 226), and the members of the defendants testified there was little difficulty in amending such documents (T.R. 355); that no import licenses are required in Peru (T.R. 357); that in any country which does not calculate its duties on an ad valorem basis, ocean freight has no bearing on import duties (T.R. 358–359). The defendants introduced evidence that Bolivia, Chile, Colombia, Ecuador, and Nicaragua require import licenses, and some of the countries which require import licenses require them only on certain commodities. Colombia issues import licenses for the F.O.B. value of the goods. Therefore, any increase in ocean freight costs would not necessitate amendment of existing import licenses. Bolivia, Chile, Nicaragua, and Ecuador issue import licenses for the C.I.F. value of the goods. These licenses are issued for a stated value, but Chilean import licenses permit imports to exceed the value stated in the licenses by 5% of the C.I.F. value of the goods; Nicaraguan import licenses permit imports to exceed the value stated in the licenses by 10% of the C.I.F. value of the goods; Ecuadorian import licenses permit imports to exceed the value stated in the licenses by 15% of the C.I.F. value of the goods, and the variations permitted from the value stated in Bolivian import licenses vary according to circumstances. An increase in 10% of ocean freight costs would rarely if ever exceed these tolerances so as to require amendment of existing licenses, and amendments to import licenses can generally be obtained without difficulty. A letter of credit can generally be amended as a matter of course whenever necessary, provided that the goods to be imported under the credit are covered by a valid import license. (Exhibit L, p. 2–3).

37. It is conceded that at least 20 rate-making entities on the Atlantic and Gulf coasts have increased their rates or given notice of increase of their rates at or about the same time as follows:

| | Conference | Increase | Effective Date |
|---|---|---|---|
| 1. | The West Coast of Italy, Sicilian and Atlantic Ports North Atlantic Range Conference | 7½% | 6/1/65 |
| 2. | U. S. Gulf–U. K. Conference | $2.50 fgt. ton or 10% on Class Rates | 6/1/65 |
| 3. | U.K./U.S. Freight Association | $2.50 fgt. ton or 10% on Class Rates | 5/1/65 |
| 4. | North Atlantic United Kingdom Freight Conference | $2.50 fgt. ton | 6/1/65 |
| 5. | North Atlantic French Atlantic Freight Conference | 7½% | 5/17/65 |
| 6. | Continental North Atlantic Westbound Freight Conference | 7½% | 4/5/65 |
| 7. | French North Atlantic Westbound Freight Conference | 7½% | 4/1/65 |
| 8. | The Japan Atlantic and Gulf Conference | 10% | 5/1/65 |
| 9. | Trans-Pacific Freight Conference | 10% | 4/1/65 |
| 10. | Smith & Johnson Shipping, Inc. (U. S. Atlantic to Mexican Gulf Ports) | 10% | 3/28/65 |
| 11. | The North Atlantic Mediterranean Freight Conference | 15% | 6/10/65 |
| 12. | The Mediterranean Westbound Freight Conference | 5% | 6/1/65 |
| 13. | Trans-Pacific Freight Conference of Japan | 10% to 14% | 1/1/65 |
| 14. | The Gulf-Mediterranean Ports Conference | 15% | 6/10/65 |
| 15. | The Mediterranean–U. S. A. Great Lakes Westbound Conference | 5% | 6/1/65 |
| 16. | East Coast South America Reefer Conference | $2.50 fgt. ton | 6/28/65 |
| 17. | River Plate & Brazil United States Reefer Conference | $2.50 fgt. ton | 6/28/65 |
| 18. | The American West African Conference | 10% (outbound) (inbound) | 5/15/65 6/1/65 |
| 19. | North Atlantic Baltic Freight Conference | $2.50 fgt. ton | 7/1/65 |
| 20. | U. S. Atlantic & Gulf Australia–New Zealand Conference | 10% | 7/18/65 |

(T. R. 130, 406–407, Exhibit H)

38. The Peruvian line, a leading non-conference competitor of defendants on the west coast of South America (T.R. 351–352), as well as many other non-conference competitors in the area served by the defendants, have imposed and are charging a 10% surcharge, on 30 days' notice (T.R. 93, 364, see last page of Appendix No. 3 to May affidavit).

## CONCLUSIONS OF LAW

(1) This Court has jurisdiction herein under the provisions of 28 U.S.C. § 1337 (1962).

■ (2) This Court has jurisdiction to grant injunctive relief to restrain the imposition of the instant surcharge by Conferences of Steamship Lines, the legality of which is under review by the Federal Maritime Commission pursuant to an order of investigation and hearing issued by the Commission.

(3) Defendants are Conferences of common carriers by water authorized to operate in the foreign waterborne commerce of the United States solely by virtue of an agreement approved by the Federal Maritime Commission under Section 15 of the Shipping Act of 1916, as amended, 46 U.S.C. § 814 (Supp.1964).

(4) The Commission in the proceedings before it, Docket No. 65–7, is investigating possible violations of Sections 15, 16, 17 and 18(b) (5) of the Shipping Act of 1916, 46 U.S.C. §§ 814, 815, 816, 817(b) (5) respectively (hereinafter referred to by reference to the sections in the Shipping Act).

■ (5) Plaintiffs have failed to show by the required degree of proof that irreparable injury or the threat of irreparable injury would result to the commerce of the United States, the public interest, shippers and/or consignees affected by the surcharge.

(6) Aside from the allegations in the complaint, there has been insufficient proof adduced in these proceedings to show any violations of Sections 15, 16, 17 and 18(b) (5) of the Shipping Act of 1916.

(7) Upon consideration of all the facts adduced before me, and a balancing of the equities involved, it is found and concluded that the injunctive relief sought should not issue and a preliminary injunction should not be granted.

## DISCUSSION

The defendant Conferences initially question the jurisdiction of this Court to hear and determine the within request for injunctive relief.

The thrust of this argument appears to be that, Congress not having given the Commission specific authorization to seek interim injunctive relief in the Federal Courts pending an administrative determination, this Court is without power to grant the requested relief.

In support of their argument, defendants cite the specific statutory authorization granted other regulatory agencies to seek interim injunctive relief, see, e. g., 16 U.S.C. § 825 m.(a) (1960) (Federal Power Commission); 15 U.S.C. § 77t(b) (1963) (Securities and Exchange Commission, and statutes cited infra at 775) and reason that this manifests an intent on the part of Congress to withhold such power from the Commission.

In addition, defendants cite the legislative history developed at the time of the 1962 amendments to the Shipping Act of 1916, wherein it appears that the Commission most strenuously requested the following powers:

"[T]he power to enter, cease and desist orders of an interlocutory nature prior to the completion of full evidentiary hearings * * *.

"'* * * [T]he Board should have the power to maintain or restore the status quo upon a prima facie showing of irreparable damage, substantial injury to the public interest or little likelihood of success on the merits. In this respect, the Board would in general be acting in a fashion similar to that of a court of equity in the disposition of applications for interlocutory injunction.'"

(Department of Commerce letter submitted to House Merchant Marine & Fisheries Committee March 20, 1961, H.R.Rep.No.498, 87th Cong. 1st Sess. 14, 22, U.S.Code Congressional and Administrative News, p. 3108. The letter is set out in Trans-Pacific Freight Conference of Japan v. Federal Maritime Bd., 112 U.S.App.D.C. 290, 302 F.2d 875, 879 (1962)). Presumably, by that request the Commission was seeking a cease and desist power similar to that possessed in certain situations by, among others, the Federal Trade Commission (15 U.S.C. § 45(b) (1963), and the National Labor Relations Board (29 U.S.C. § 160(c) (1956)).

In the case of the Commission, not only has Congress not authorized it to issue cease and desist orders, but, in addition, as distinguished from other regulatory agencies (see, e. g., 15 U.S.C. § 53(a) (1963) (Federal Trade Commission); 29 U.S.C. § 160(j) (1956) (National Labor Relations Board)), see Note, Interim Injunctive Relief Pending Administrative Determination, 49 Colum. L.Rev. 1124 n. 3 (1949)) Congress has not specifically authorized it to obtain this interim injunctive relief by application to an appropriate District Court. Lastly, defendants argue that the recent Supreme Court decision in Arrow Transp. Co. v. Southern Ry., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963) and the long line of cases upon which it relied, are dispositive of the issue before the Court and that, accordingly, the Court cannot grant the Commission power not granted to it by Congress in its enabling statute.

█ Initially, it must be observed that there is ample authority for the proposition that mere failure of Congress to grant specific authorization to seek injunctive relief does not manifest an intent thereby to preclude resort to that remedy. See Walling v. Brooklyn Braid Co., 152 F.2d 938 (2d Cir. 1945); NLRB

v. New York State Labor Relations Bd., 106 F.Supp. 749 (S.D.N.Y.1952); Arrow Transp. Co. v. Southern Ry., 372 U.S. 658, 673, 679, 83 S.Ct. 984 (1963) (Dissenting opinion per Clark, J.); Note, Interim Injunctive Relief Pending Administrative Determination, supra. See also Isbrandtsen Co. v. United States, 81 F.Supp. 544, 547 (S.D.N.Y.1948), appeal dismissed, Rederi v. Isbrandtsen Co., 336 U.S. 941, 69 S.Ct. 813, 93 L.Ed. 1099 (1949).

Even more persuasive, however, are the authorities cited by the Commission, and heretofore cited by this Court during the course of oral argument, which clearly support the finding of jurisdiction to grant the requested relief.

In West India Fruit & S. S. Co. v. Seatrain Lines, Inc., 170 F.2d 775 (2d Cir. 1948), petition for cert. dismissed 336 U.S. 908, 69 S.Ct. 514, 93 L.Ed. 1072 (1949), the plaintiff Steamship Company had instituted suit to restrain the defendant from putting into effect its rate reduction pending a decision by the United States Maritime Commission in a proceeding then before it involving the rates. The Commission intervened in support of the requested relief.

The Court, in affirming the jurisdiction of the lower court, stated as follows:

"Defendant, Seatrain, contends that the district court lacked power to issue an injunction in aid of the Commission, regardless of the facts. We cannot agree, especially as the Commission has intervened as a party plaintiff. * * * Here the court was asked to assist the Commission by preserving the status quo until it could determine whether it had statutory jurisdiction, and, if so, how it should act." Id. at 778, 779.[1]

The defendants do not argue that the fact that the Commission is here the plaintiff, rather than the intervenor, distinguishes Seatrain, supra. (T.R. 16, 17.)

1. It is interesting to note that the main averment in the instant complaint, namely, Paragraph 15, is very closely modeled after Paragraph 4 of the plaintiff-intervenor's (Commission's) complaint in Seatrain, supra. Appendix to brief for appellant, Seatrain Lines, Inc. v. West India Fruit & S. S. Co. at 153.

In fact, the present case presents an *a fortiori* situation. In Seatrain it was the Commission's presence which may very well have been the key to the decision (3 Davis, Administrative Law Treatise § 20.05 at 91 n. 46 (1958) ), whereas in the case at bar it is the Commission itself which is bringing suit to maintain the status quo in aid of its primary jurisdiction. Cf., Board of Governors of Federal Reserve System v. Transamerica Corp., 184 F.2d 311, 315–318 (9th Cir. 1950) (Per curiam).[2]

■ Subsequent to Seatrain, supra, and in reliance thereon, the courts have, even on the petition of a private party, restrained the carrying out of agreements between Conference carriers pending a determination of their validity in a proceeding then pending before the Maritime Commission. Isbrandtsen Co. v. United States, 81 F.Supp. 544 (S.D. N.Y.1948), appeal dismissed, Rederi v. Isbrandtsen Co., 336 U.S. 941, 69 S.Ct. 813 (1949). "Since the Commission disclaims the power to afford temporary relief, and the equitable power of the court to preserve the status quo * * * has not been withdrawn by statute [citing Seatrain] an injunction as prayed should issue * * *." Id. 81 F.Supp. at 547. The courts have reiterated the proposition that an injunction in aid of the administrative agency's process and to maintain the status quo may be granted in the exercise of the inherent equity powers of the court. United States Trucking Corp. v. American Export Lines, Inc., 146 F.Supp. 924, 925 (S.D. N.Y.1956); Pennsylvania Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n, 183 F.Supp. 910 (E.D. Pa.1960); Reeber v. Rossell, 91 F.Supp. 108, 113 (S.D.N.Y.1950) ("[T]he deci-

sion [Seatrain] established the power of the Court to issue an injunction to prevent undue harm pending an administrative proceeding."); see Note-Interim Injunctive Relief Pending Administrative Determination, 49 Colum.L.Rev. 1124 (1949).

■ As noted above, the fact that Congress did not grant the Commission the power to issue a cease and desist order has no bearing on the inherent power of this Court, exercising traditional equity principles, to maintain the status quo pending administrative action, on a petition by the administrative agency itself. In fact, subsequent to the enactment of the 1962 Amendments to the Shipping Act of 1916, this inherent power in the court was once again reaffirmed in a Report of the Anti-Trust Subcommittee of the House Judiciary Committee. Therein, after noting the problem of a cease and desist power in the Commission, the report states:

"Irrespective of its cease and desist authority the Board could, under proper circumstances, have sought the aid of the courts in obtaining injunctive relief against carriers effectuating unapproved agreements." [Citing Seatrain.]

(The Ocean Freight Industry, Report of the Anti-Trust Subcommittee of the Committee on the Judiciary, House of Representatives, 87th Cong.2d Sess. House Report No. 1419 at 344 (March 1, 1962)).[3]

Accordingly, what the Court is doing herein is not to disrupt the regulatory and rate scheme of an agency (Arrow Transp., supra), or to invest the Commission with a cease and desist power that it was not granted pursuant to statute

---

2. This fact is also dispositive of defendants' second affirmative defense relating to primary jurisdiction. See Davis, supra, § 19.02 at 13–14.

3. The argument of defendants relating to the request by the Commission for cease and desist power and the failure of Congress to grant it acts against defendants as much as in their favor. For the

fact that the Commission did not in addition to cease and desist power request specific authorization to seek interim injunctive relief, reveals that the Commission, and Congress for that matter, in reliance on Seatrain, may very well have assumed that it possessed at least that power, even in the absence of specific statutory authorization.

(Trans-Pacific Freight Conference of Japan, supra); rather, the Court is exercising *its* inherent power, not that of the Commission, pursuant to 28 U.S.C. § 1337 (1962) to prevent irreparable harm and maintain the status quo pending an administrative decision, applying traditional concepts of equity jurisprudence. The Commission, in its petition, alleges violations of the Shipping Act. Accepting those allegations as true for the purposes of a determination as to jurisdiction, I believe that the Court has both the power to act and the duty to do so as well.

However, having decided that this Court is vested with jurisdiction, I approach what I perceive to be the main obstacle to the granting of the relief herein, namely, whether the Commission has made the requisite showing to entitle it to the drastic remedy of a preliminary injunction.

With respect to the question of proof sufficient to support the grant of a preliminary injunction, the instant proceeding is to be distinguished from those instances wherein specific statutory authorization has been given to an administrative agency to seek injunctive relief.

Thus, for example, in a suit brought by the Federal Trade Commission pursuant to 15 U.S.C. § 53(a) (1963), the standard to be applied is whether the Commission "has reason to believe" that certain provisions of the act have been violated. FTC v. Sterling Drug, Inc., 215 F.Supp. 327 (S.D.N.Y.), aff'd, 317 F.2d 669, 678 (2d Cir. 1963). FTC v. Rhodes Pharmacal Co., 191 F.2d 744, 747–748 (7th Cir. 1951). Similarly, in suits by the National Labor Relations Board, all the Regional Director must show is that he has "reasonable cause to believe" that an unfair labor practice has been committed. Douds v. International Longshoremen's Ass'n, 242 F.2d 808 (2d Cir. 1957). The same "reasonable ground for belief" standard applies in suits by the Interstate Commerce Commission under 49 U.S.C. § 43 (Supp.1964).

It has also been held that, on suit by an agency for injunctive relief pursuant to statutory authorization, "[i]t is not necessary for the plaintiffs to show irreparable injury to entitle them to an injunction, for the right to an injunction is specifically conferred by the statute." CAB v. Modern Air Transp. Inc., 81 F. Supp. 803, 806 (S.D.N.Y.1949), aff'd, 179 F.2d 622 (2d Cir. 1950) (suit pursuant to the predecessor of 49 U.S.C. § 1487 (1937). See SEC v. Torr, 87 F.2d 446, 450 (2d Cir. 1937) (15 U.S.C. § 77t(b)); nor must the agency aver that there is no adequate remedy at law. SEC v. Jones, 85 F.2d 17 (2d Cir. 1936) (Per curiam), cert. denied, 299 U.S. 581, 57 S.Ct. 46, 81 L.Ed. 428 (1937). See Comment, The Statutory Injunction as an Enforcement Weapon of Federal Agencies, 57 Yale L.J. 1023, 1026–34 (1948).

Accordingly, I now proceed to determine whether, applying normal equitable principles (see Note, supra, 49 Colum.L. Rev. at 1130), plaintiffs have presented sufficient facts to warrant the grant of injunctive relief.

The classical task of a court of equity is to balance the respective equities to determine whether in the exercise of its discretion a preliminary injunction should issue.

The Court of Appeals for this Circuit has succinctly summed up this doctrine of balancing the equities or conveniences: "The judge must consider whether irreparable harm is likely to result to plaintiff if *pendente lite* (i. e., 'immediately') the injunction is denied, and against this harm he must balance the harm to defendant likely to result if the relief is granted." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 743 (2d Cir. 1953). Stated in a different way, "the Court must weigh the equities which favor or militate against the respective parties in terms of who is likely to suffer the greater injury if the injunction is granted or denied pending a trial of the issues." Blaich v. National Football League, 212 F.Supp. 319 322–323 (S.D. N.Y.1962).

The statement by Judge Bazelon in Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601, 602 (1951), best sums up

the problems facing the Court in a motion of this type:

"When a motion for preliminary injunction is presented to a court in advance of hearing on the merits, it is called upon to exercise its discretion 'upon the basis of a series of estimates: the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success or failure of the suit, the balancing of damage and convenience generally. A mere listing of the guiding considerations demonstrates their intangible nature, especially when no attempt is made at this stage to decide finally the questions raised.' Concurring opinion in Communist Party v. McGrath, D.C., 96 F.Supp. 47, 48."

The problem is compounded in the case at bar, for the Court must be careful not to impinge on the primary jurisdiction of the administrative agency. For this Court would be loath to make a determination to any extent on the merits of the proceedings pending before the Commission and no such finding is intended. I am only weighing the equities of the respective positions and finding whether sufficient evidence has been introduced to warrant the relief. The fact that the agency has not succeeded herein is based on the evidence, or lack thereof, presented in this hearing and in no way indicates the strength or weakness of the plaintiffs' position in the hearings and proceedings before the Commission.

There is no doubt but that the public interest, if shown, is a highly relevant factor to be considered. See Benson Hotel Corp. v. Woods, 168 F.2d 694 (8th Cir. 1948). However, "[w]hat is in the public interest may at times be debatable; or elements of the public interest may be on both sides of the controversy." 7 Moore, Federal Practice, ¶65.04 [2] at 1634 (2d ed. 1955).

In support of this public interest argument, plaintiffs, in addition to both affidavits and live testimony from private parties (which will be discussed infra) submitted affidavits of Charles A. Murphy, Under-Secretary of Agriculture, William S. Gaud, Deputy Administrator of the Agency for International Development, and Daniel L. Goldy, National Export Expansion Co-ordinator. In addition, Timothy J. May, Managing Director of the Federal Maritime Commission, testified in court.

The affidavit of Murphy discusses increased freight cost in general and sets forth the obvious fact that an increase in cost is burdensome, and it is preferable if goods could be shipped at reduced rates. He at no point, however, relates his views specifically to the surcharge involved in the instant case and at no point demonstrates the main issue before the Court, namely, the difference between the normal ninety-day notice provision of the dual rate contract and the emergency thirty-day notice provision of Article 10(c) thereof. Furthermore, dry bulk and liquid chemical bulk are not included within Section 14b and bulk articles of any kind are not included within Section 18(b) aside from certain exceptions not applicable hereto. Accordingly, it appears that the requirements of Section 18(b) do not cover the agricultural products covered by Murphy's affidavit. Furthermore, he does not qualify his affidavit specifically to those areas in South and Latin America serviced by the Conferences here involved.

Similarly, the affidavit of Daniel Goldy states that "imposition of surcharges upon freight shipped from Latin American ports to the United States may increase the price of bulk commodities. * * *" As noted above, bulk commodities generally are not included within the dual rate contract under Sections 14b and 18(b) of the Act. In addition, he discusses Latin American markets without reference to the specific areas here included. Finally, the affidavit generally discusses price increases but at no point relates the broad statements made to the specific problem here involved, namely, a 10 percent surcharge imposed on thirty days' notice rather than the normal ninety days' notice.

The affidavit of Mr. Gaud, while more relevant, suffers from the same defects as those mentioned above, namely, broad statements involving "Latin America" rather than the areas specifically involved herein. More importantly, however, he also discusses the surcharge from the standpoint of increase of costs rather than in the light of a thirty days' as opposed to ninety days' notice. No one will dispute that increased freight rates are burdensome and increase costs but other carriers have increased their rates by 10 percent and more without objection (see Findings of Fact 37). The main issue is therefore the notice given. The only clearly relevant and persuasive averment is that contained in Paragraph 7 of the Gaud affidavit which will be dealt with when the "irreparable harm" criteria is discussed infra. Plaintiffs' Exhibit 29, a telegram from the Peruvian Embassy, while asserting that the surcharge is "unjust and abusive" specifically deals with it from the standpoint of freight increases and conveniently does not make reference to the fact that the Peruvian Lines, a non-Conference carrier, has imposed a 10 percent surcharge as well, presumably also on thirty days' notice, under Section 18(b) (2). (T.R. 364.)

The testimony of Timothy May was in the same vein, namely, conclusory rather than factual and while no doubt his expertise is entitled to weight, it is the Court's conclusion rather than his which is determinative. Aside from the exhibits he introduced and the stated views of the Commission, he supplied no facts and figures to support his conclusion that the public interest required the grant of the instant relief. The most persuasive evidence submitted by the Government was the live testimony of

shippers adversely affected by the surcharge, which testimony was contradicted, however, and counter-balanced by the testimony introduced by the defendant Conferences through the officials of the respective carriers who testified as to how they were adversely affected by the strike which caused the imposition of the surcharge.

We now proceed to what I consider the crux of the Government's case and upon which the claim of irreparable harm is predicated, namely, the testimony, both live and by affidavit of the individual shippers.

The affidavits submitted on plaintiffs' behalf fall into three categories: (a) Port officials who discuss the matter of port congestion (Plaintiffs' Exhibits 8–16, 23; (b) those of freight forwarders who, in conclusory and self-serving fashion, state that the congestion that did exist has cleared up sufficiently so that the imposition of a surcharge is unwarranted (Plaintiffs' Exhibits 17–22; [4] (c) affidavits of shippers, some of whom testified in court, setting forth facts upon which they predicate the claim of irreparable harm as a result of the surcharge. (Plaintiffs' Exhibits 24–27.)

The thrust of the shippers' argument is that they make contracts with consignees and quote prices based on freight costs having at least a ninety-day stability and that if the freight costs are now increased on only thirty days' notice they will either have to absorb the increase on prices already quoted and which allegedly cannot be changed without loss of the sale, or the cost can be passed on to the consignee, which "may" or "possibly" will result in the loss of the sale and perhaps the market.[5] The argument is also made that where rates are increased on ninety days' notice, the Commission

4. The affidavits are cut from the same mold and appear to be copied from the same original. Furthermore, it appears that they argued not so much with the notice problem but rather with increased costs *per se.*

5. They also discussed the problems with respect to Letters of Credit and Import License. However, this testimony was contradicted by the defendants both in testimony (see, e. g., T.R. 226, 355, 357, 358–59) and affidavit. (Defendants' Exhibit L.) See Findings of Fact 36.

has that much more time to investigate the legality of the increase.[6]

To date there has been no reported loss. However, this is not determinative since the Court stayed the effect of the surcharge three days after it was to take effect.

On the other hand, there are countervailing factors to those arguments.

It seems clear that the shippers were fully cognizant of Article 10(c), permitting an increase on thirty days' notice. In fact, the Article was included in the dual rate contract only after full and public hearings before the Commission in Docket 11–11. In addition, this Article has been invoked without objection under strikingly similar circumstances in the port Callao, Peru (T.R. 412, 435, 436). Furthermore, the shippers, when said Article is invoked, may without penalty withdraw from the contract and ship via nonconference carriers. While there is conflicting testimony as to the effectiveness of non-conference competition, it is noteworthy that the defendants, who do not have the burden of proof, have put in more convincing evidence on the point than the plaintiffs. Accordingly, in view of the conflict and failure of proof on an important point, I can make no definitive finding thereon. In addition, I think it noteworthy that of the 7500 shippers allegedly covered by the surcharge, and presumably notified about it, only a total of 23 complaints have been received by the Commission, some of them solicited, and a total of 26 complaints received by the Conference. There has been only one request to withdraw from the contract without penalty and no requests for relief from the surcharge. In fact, it appears that at least one shipper commended the Conference for imposing a temporary surcharge as compared with the permanent increases imposed by other carriers. (T.R. 427.) Moreover, insofar as the shippers who have complained and testified in court that the surcharge would "possibly" cause a loss of sale, such would be the case only if the increase were passed on to the consignee. Presumably, there would be no such loss if it were absorbed by the company itself. In addition, had the normal ninety-day notice been given the surcharge would have gone into effect on June 4, 1965, and since other carriers have increased their rates in the same percentage on ninety days' notice without objection by the Commission, the Commission in this case as well would presumably not have objected. Thus, insofar as shippers' losses are concerned, we are talking about possible losses on a total of two months' worth of sales (i. e., the difference between thirty days' and ninety days' notice) if the shipper is required to absorb the loss and it cannot be passed on to the consignee.

Thus, what the question of irreparable harm boils down to is who should suffer the loss, the shippers represented by the Commission, or the defendant carriers?

Another important consideration is the fact that if the surcharge is found to have been wrongfully imposed, the shipper has a means of recouping his losses by a suit for reparations before the Commission or under Article 14 of the contract in a suit for breach of contract in the New York State Supreme Court; and if he absorbs the increased cost, his damages are computable almost to the penny. On the other hand, if the Conference is presently enjoined, it may never recover its losses due to the strike and thus has no adequate remedy at law.

The fact that this reparations procedure or suit for damages may be cumbersome and inconvenient does not in and of itself constitute irreparable injury which will entitle a party to an injunction. See Blaich v. National Football League, 212 F.Supp. 319, 323 (S.D.

---

6. I might observe parenthetically that the increases set forth in Findings of Fact 37 were all on ninety days' notice and as of this point there is no evidence that the Commission has found them to have been improperly imposed, nor does it appear whether an investigation of those rates has even been instituted. (T.R. 503.)

N.Y.1962). The loss is nonetheless compensable and the damages ascertainable and as the Court of Appeals for this Circuit has stated: "since any loss so caused could, if a wrong, be adequately redressed by money damages ascertainable upon proof, it does not constitute the irreparable injury necessary to justify an injunction *pendente lite.*" Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir. 1953). See Paramount Pictures Corp. v. Holden, 166 F.Supp. 684, 690 (S.D.Calif.1958).

The defendants' testimony has shown the congestion existent in the various ports as of March 5, 1965, resulting from a longshoremen's strike which was not anticipated and which it was thought would end momentarily. There is no evidence submitted by the Government to refute this contention of congestion as of March 5, 1965. As a result thereof, the circumstances described in Findings of Fact 21–28 resulted. The defendants' testimony further showed that this congestion still exists in varying degrees in the ports along the Atlantic and Gulf Coasts.

Plaintiffs introduced affidavits stating that no congestion as of the present exists in Morehead City and Wilmington, North Carolina (Exhib. 8); in Miami, Florida (Exhib. 9); Mobile, Alabama (Exhib. 10); Port Everglades, Florida (Exhib. 11); Galveston, Texas (Exhib. 12); Savannah and Brunswick, Georgia (Exhib. 15); Corpus Christi, Texas (Exhib. 14). However, those affidavits were sworn to approximately the 8th day of April 1965, and spoke of the situation as of that time and not as of March 5th when the surcharge was noticed. Moreover, insofar as New Orleans is concerned, Plaintiffs' Exhibit 13 states that normalcy is not expected until the latter part of April 1965 and as to some of the other ports normalcy had only recently returned. The affidavits, however, by no means exhausted the number of ports on the Atlantic and Gulf coasts, and the effect of at least one affidavit, Plaintiffs' Exhibit 23, the affidavit of Colonel Hanes, Treasurer of the American Stevedores, Inc., was substantially impaired by a later affidavit of the same gentleman. (Defendants' Exhibit M.)

The shippers themselves testified that congestion in varying degrees still exists in some ports. In addition, and of equal importance, is the uncontradicted testimony of defendants that the congestion has now shifted to the Latin American ports where it still exists and will continue for some time. In any event, there is substantial conflict on this point as well, and, accordingly, plaintiffs have here also failed to make the necessary prima facie showing of an unwarranted invocation of Article 10(c).

On the basis of this sharply conflicting testimony can this Court find that plaintiffs, as opposed to defendants, will suffer irreparable injury [7] and that the equities are so preponderantly in favor of the plaintiffs as to require injunctive relief? I think not.[8] The balance of equities is at least even on the basis of the evidence adduced before me since the invocation of Article 10(c), which is the heart of the instant dispute, has not been shown to have been so unwarranted as to deprive the defendants of the many equities heretofore set out, existing in their favor.

As was stated by this court in Richard J. Spitz, Inc. v. Dill, 140 F.Supp. 947, 949 (S.D.N.Y.1956): "To grant, in the face of the sharply contraverted issues of fact, the broad injunctive preliminary relief which would yield to the plaintiff all that it could secure only after a trial upon the merits would not be wise exercise of discretion."

Another consideration not to be lightly weighed is the fact that by a grant of

---

7. Irreparable harm in this context meaning "irremediable injury" that is certain and great. Love v. Atchison T. & S. F. Ry., 185 F. 321, 331–332 (8th Cir. 1911).

8. See Truly v. Wanzer, 5 How. 141, 142–143, 12 L.Ed. 88 (1847).

the requested relief which by its terms is preliminary, plaintiff will achieve all that he could after trial on the merits. The 10 percent surcharge, by its terms, will expire no later than October 3, 1965, and the requested injunction is to expire thirty days after a determination by the Commission as to the validity of the surcharge. Accordingly, if the Commission's determination is not rendered before September 1965, the surcharge, even if declared valid, will never have gone into effect. Thus, plaintiffs will have secured all the relief they could have gotten after trial on the merits without having proved their case *on the merits* by the required degree of proof.

In addition, while I do not intend to encroach on the Commission's primary jurisdiction, or the merits of the proceeding pending before it, some determination must be made based on the evidence before me as to the likelihood of plaintiffs' position ultimately prevailing. For the Commission cannot on the one hand invoke the equity powers of this Court and, at the same time, prevent this Court from applying normal equitable criteria to the proceedings.

The various criteria applied in determining the quantum of proof as to ultimate success are set forth in Dinkins v. General Aniline & Film Corp., 214 F. Supp. 276, 279 (S.D.N.Y.1962). Suffice it to say that even applying the most liberal standard set forth therein I find the record devoid of any evidence of statutory violations.

As Judge Weinfeld of this court has stated: "While it is true that the likelihood of plaintiffs' ultimate success is not the sole criterion on their motion for a preliminary injunction, the absence of a clear prospect that they will eventually prevail upon the trial is a factor of significance." Blaich v. National Football League, supra, 212 F.Supp. at 324.

There has been no testimony adduced before me as to any illegal discrimination by defendants either between shippers or ports, or any preference to any shipper over another, or that the rates with the surcharge are either so unreasonably high or low as to be detrimental to the commerce of the United States, or that there is a preference and therefore discrimination as to commodities.

While reference is made to illegal discrimination between commodities, it seems that this allegation is predicated on the fact that the surcharge did not take effect as of April 5, 1965, as to all goods covered by the dual rate contract. However, this fact was necessitated by the statutory provision prohibiting an increase in rates, on rates not then in effect for ninety days, and, accordingly, the surcharge was to take effect as the rate on each commodity fulfilled this ninety-day requirement. I might further observe that if—as is conceded—the rates in effect on March 4, 1965, were approved by the Commission and hence not illegally discriminatory, it is hard to see how an across-the-board 10 percent increase to take effect as a statutory requirement is met, can be discriminatory.

Furthermore, and I believe of prime importance in this proceeding, is the failure of plaintiffs to show that the invocation of Article 10(c) by the carriers was not warranted by the circumstances.

I want it made clear, however, that my findings are predicated on insufficiency of proof as adduced before me, not on insufficiency of proof in the Commission's possession or which it will acquire and present in the proceedings before it.

Accordingly, I am constrained to hold that a requisite showing has not been made to permit the exercise by this Court of its equity powers.

The injunction prayed for is accordingly denied, and the temporary restraining order heretofore imposed on April 7, 1965, and extended for an additional ten days by the Court on April 17, 1965, is hereby vacated.

So ordered.